MATTEAWAN MANUFACTURING COMPANY, Respondent, Appellant,
*v.* CHEMICAL BANK AND TRUST COMPANY, Respondent, Appellant,
and THE MIDNIGHT MISSION, Appellant, Respondent.

First Department, May 3, 1935.

*Orison S. Marden* of counsel [*David Paine* and *Charles J. Fay* with him on the brief; *White & Case*, attorneys], for the plaintiff.

*Justus Sheffield* of counsel [*Philip A. Carroll* and *Jack D. Gunther* with him on the brief; *Shearman & Sterling*, attorneys], for the defendant Chemical Bank and Trust Company.

*Walbridge S. Taft* of counsel [*Malcolm S. Langford* with him on the brief; *Cadwalader, Wickersham & Taft*, attorneys], for the defendant The Midnight Mission.

TOWNLEY, J.   This action was brought by plaintiff, a depositor of the Chemical Bank and Trust Company (hereinafter called the Chemical Bank), against both defendants for money had and received.   The complaint in two causes of action states that two checks, one for $5,000 and another for $21,000, were converted by the Chemical Bank and defendant The Midnight Mission (hereinafter called Mission).

The diversion of the proceeds of these checks resulted from the acts of a thief named Parkman, an employee of Henderson & Co., stockbrokers.   Plaintiff Matteawan Manufacturing Company (hereinafter called Matteawan) was a corporation in which various members of the Henderson family held stock.   The Midnight Mission was a charitable organization in which the same family were interested.   All three associations had their offices in the same place. Parkman was a confidential clerk and customer's man of Henderson & Co.   He had also been for years a director and cashier of Matteawan, and trustee, secretary, assistant treasurer and general manager of the Mission.   His confidential employment with the three groups had lasted for over twenty years.   He prepared most of the checks of Matteawan on its six bank accounts and was in charge of its check books.   No other officer of Matteawan ever paid any attention to the books.   Matteawan never had a general audit.   No audit had been made of the Mission's affairs in fifteen years.   Parkman made all the entries in the Mission's books, made all its bank deposits and for many years had been the only person to draw checks upon its bank account.   He was authorized to draw checks on his sole signature.   For fifteen years, Parkman had been misappropriating sums from Matteawan's account which misappropriations had aggregated $15,000.   He had also within the same time taken some $21,000 from the Mission.   His own income per annum totaled about $4,650.   He carried a speculative margin account with Henderson & Co. in his wife's name which at the time of the transactions in suit was under-margined by about $6,000. In this situation the checks involved in the complaint were drawn.

The first check, dated September 14, 1931, for $5,000, was drawn on the Hanover National Bank to the order of the defendant Chemical Bank.   Parkman prepared the check and presented it to

Donald, plaintiff's secretary, for signature, stating that it was to effect a transfer of funds from the checking account at the Hanover National Bank to the time account at the Chemical Bank. The secretary signed and handed Parkman the check to deposit.. Parkman, instead of depositing it to plaintiff's account at the Chemical Bank filled out a deposit slip to the credit of the Mission which also had an account there. Parkman then deposited the check with that slip. The Chemical Bank accepted the deposit and placed it to the credit of the Mission and the proceeds were collected from the drawee. Parkman, by two Mission checks signed by himself as officer of the Mission, withdrew $5,000 which was appropriated to his own purposes. These amounts were drawn out in two installments, one for $3,000 on September 17, 1931, and the other for $2,000 October 7, 1931, thus leaving the credit balance of the Mission the same as it would have been if the $5,000 had not been put in. Most of the $5,000 went to the benefit of Henderson & Co. to make good the margin in Parkman's wife's account. Some household bills, however, were also paid out of this money.

Judgment has been granted against the Mission in favor of the plaintiff on its first cause of action for $5,000. The allowance of this claim was error. The decision of the Court of Appeals in the case of *Credit Alliance Corp.* v. *Sheridan Theatre Co.* (241 N. Y. 216) is conclusive. In that case the president of the Sheridan Theatre Company borrowed money from the Credit Alliance Corporation, plaintiff, stating that it was for the theatre company. The president gave promissory notes of the theatre company to which he signed his own name as president and forged the other necessary signatures. The credit company gave the president a check payable to the theatre company which he deposited in the theatre company's bank account. He then drew the theatre company's check to his own order and used the money for his own purposes. The Credit Alliance company sought to recover from the theatre company in an action for money had and received. The Court of Appeals held that the president of the theatre company had been acting for himself rather than for the defendant corporation when he made the deposit in its own account and that his knowledge could not be attributed to the defendant. The court said: " The money, having been immediately withdrawn by Spiegel [defendant's president] and converted to his own use without the corporation's knowledge of the transaction or that the funds had ever been placed to its credit, it enjoyed no benefit and exercised no dominion over the same." The Appellate Division, which was reversed in that case, had held that the mere fact that money came into the treasury of the other corporation made that corporation *eo instanti* liable

to the plaintiff in an action for money had and received. (210 App. Div. 599.) The Court of Appeals said that the mere possession of the money did not make the theatre company a debtor of the plaintiff. To create the relation of debtor and creditor, there must be a consent to be a debtor by some act of acceptance of the money deposited. We think that the facts in that case cannot be distinguished from the facts concerning the deposit of $5,000 and that it was error to grant judgment for that amount against the Mission.

Parkman had also defaulted as trustee of the Mission. Between October, 1929, and November, 1930, he had abstracted some twenty-one bearer bonds from the Mission's safe deposit box without the knowledge or authority of the officers of the Mission. He sold these bonds for $20,895.98 and converted the proceeds. He wanted to repay this sum.

On February 10, 1932, he prepared a check of the plaintiff for $21,000 drawn on the Chemical Bank to the order of that same bank. He presented it to Donald for signature saying that it represented a transfer of funds. Plaintiff at that time had only one account with the Chemical Bank and had Donald thought for a moment he would have realized that the explanation was meaningless. However, the check was signed. Parkman testified that he thereafter wrote upon its face the words " Credit to the order of Midnight Mission " without Donald's knowledge, made out a deposit slip in the name of the Mission and deposited the check with the defendant bank. The bank credited the Mission with the amount of the check. The canceled check was returned to Matteawan and destroyed by Parkman.

That $21,000 was disposed of for the purchase of exactly the same number of bearer bonds as had been previously abstracted and converted from the funds of the Mission. A small cash balance remains in the Mission's account. The order for the purchase of these bonds was made on Henderson & Co. and they were paid for by a check drawn on the Mission's account and signed by Parkman. Henderson & Co. delivered the bonds to Parkman on March 16, 1932.

Parkman then telephoned to the treasurer and trustee of the Mission, Gawtry, and asked Gawtry to go with him to the safe deposit box of the Mission to cut coupons. Gawtry had never been to the box of the Mission but went in place of Mr. Norman Henderson then recently deceased who had theretofore always gone to the box with Parkman. While Gawtry was cutting coupons, Parkman surreptitiously replaced the bonds and then suggested that Gawtry check the bonds with him against the list. Gawtry did this, found the bonds intact and assumed as an innocent trustee of the Mission that its funds were not only intact but had always been so.

It is the claim of the plaintiff that the Mission is liable for this $21,000 as money had and received. It is the claim of the Mission that no money ever came under the control of the Mission, that the Mission received the negotiable bonds for value and in good faith and holds them in due course, that Parkman's knowledge is not attributable to the Mission and that where one of two innocent parties must suffer from the act of a wrongdoer, the loss should be left where it has fallen.

The liability of the Mission to return as much of the $21,000 as was not due them for any loss suffered by the prior defalcation of Parkman is clear.

The question whether the balance of the money received must be returned to the plaintiff depends upon the interpretation of prior decisions in the State in so far as they apply to the case at bar. It has been settled that if a wrongdoer acts on his own behalf in stealing from one of two innocent parties to pay a debt which he owes to another innocent party, the knowledge of the wrongdoer will not be imputed to the beneficiary of the wrong. Since there is a good consideration for the receipt of a negotiable instrument under these circumstances, it will be deemed that the loss should lie where the courts find it and the transaction will not be undone. (See *Stephens v. Board of Education*, 79 N. Y. 183, and *Casco Nat. Bank v. Clark*, 139 id. 307.) Numerous other decisions since then, including *Aneless Corporation v. Woodward* (262 N. Y. 326), have come to the same result and have materially modified if not completely overruled the earlier view taken by the Court of Appeals in *Holden v. New York & Erie Bank* (72 N. Y. 286). That case stood for the proposition that if the benefit which comes to the person whose property has been restored is due to the active proceedings of a duly authorized agent of the beneficiary acting in his official capacity, the guilty knowledge of that agent is imputed to the principal and that principal is not able to keep the fruits of the agent's tort.

However, the doctrine of imputed knowledge has not been entirely discarded. The latest statement of the position of the Court of Appeals seems to have been made in the *Aneless Case (supra)*. The facts of that case are as follows: Plaintiff's treasurer, who was also the agent and attorney in this country for the defendant, a non-resident, was empowered to issue corporate checks of the plaintiff for corporate purposes. To discharge a personal indebtedness to the defendant, this wrongdoing treasurer drew plaintiff's corporate check in favor of the defendant, caused it to be certified, wrote upon the back the words " for deposit to the credit of " defendant, indorsed the name of the plaintiff and his own as treasurer and thereupon delivered the check to a bank other than one on

which it was drawn. He sent defendant a duplicate deposit slip which did not indicate the form of the check. The bank of deposit collected the check and paid the proceeds to the defendant without knowledge that the check was drawn to pay the treasurer's personal indebtedness. Defendant also had no knowledge that the funds used to pay him belonged to the plaintiff.

The Court of Appeals said that since there was no evidence that the defendant either personally or through his agent, the collecting bank, had notice of the diversion of plaintiff's funds, plaintiff could not recover. It further said that either actual knowledge must have been possessed by him that the individual debt was paid by corporate check or actual knowledge by the bank that the corporate check was drawn to discharge a personal debt. The bank knew that it was a corporate check but the corporate check was good on its face and that conveyed nothing to the bank; the defendant knew that the debt was being discharged but did not know that it was being discharged with stolen money. The court decided: " In order to hold defendant, either actual knowledge must have been possessed by him that the individual debt was paid by corporate check or actual knowledge by the bank that the corporate check was drawn to discharge a personal debt. If defendant's agent had known both these facts, *or if any circumstance had been sufficient to put it on notice,* its knowledge or notice would be imputable to defendant. But the mere knowledge of an agent in relation to the particular form of a written instrument which apparently is properly used in the usual course of business is not imputable to one who in good faith and for consideration becomes the beneficiary." (Italics ours.) It was also said concerning the defaulting agent that on such facts as these the agent was acting for no one.

" His fraudulent performance was for his own benefit. He was merely defendant's debtor and plaintiff's despoiler. He simply paid a debt in his own behalf with other people's money. It was the bank and only the bank which acted as defendant's agent and its powers were restricted to receipt of the deposit for collection and transmission. Without purporting to indorse as defendant's agent, Wile [the thief] did pretend to act for plaintiff in instructing the collecting bank to receive the deposit for defendant's account. Defendant never saw the check. His agent for a limited purpose never was aware and was under no duty to make inquiry in relation to the situation forming the background of its issue."

The words cited have an obvious application to the case at bar. They direct us to hold that Parkman in this transaction was acting as the debtor of the Mission and the despoiler of the plaintiff

for his own ends. Accordingly, the only agent whose conduct must be considered with a view to imputing knowledge to the Mission is that of the Chemical Bank, both the drawee of the plaintiff and the payee of the check, as well as the Mission's agent for collecting credits deposited to its account.

Judge O'Brien's opinion in the *Aneless Case* (*supra*) indicates that an agent for a limited purpose was, under the circumstances there presented, under no duty to make inquiry in relation to the situation forming the background of the issuing of the check because there was nothing about the check which would arouse question.

In the present case such is not the fact. A check drawn to the order of the Chemical Bank on itself conveys nothing to it as payee as to the disposition of the funds and inquiry must be made elsewhere. This inquiry, of course, must take the form of securing instructions from plaintiff's duly authorized agents. No inquiry was made in this case. Whether the Chemical Bank was warranted in acting on the instructions of the deposit slip of the Mission which, of course, was not the payee of the check, can admit of but one answer, namely, that no such reliance was justified. Indeed, it has been so held by the Court of Appeals in *Sims* v. *U. S. Trust Co. of New York* (103 N. Y. 472).

In that case a Dr. Sims had drawn a check to the order of the United States Trust Company on the People's Bank of New York. He gave the check to one Crowell, telling Crowell to deposit it to Sims' credit with the United States Trust Company. Crowell had a certificate of deposit issued payable to himself as trustee for Sims and shortly thereafter drew the money and converted it. The court said: " The check upon its face imported the ownership of the moneys represented in it by Dr. Sims, and his desire that its custody should be transferred from the People's Bank to the defendant. This certainly did not warrant the defendant in supposing that Dr. Sims thereby intended to pay $5,000 to Crowell, or place him for any purpose in possession of the fund. If he had so intended, the check would have been made payable to Crowell's order, and there would have been no need of the agency of the defendant in the transaction. The use of the defendant's name as payee of the check indicated the drawer's intention to lodge the moneys in its custody and place them under its control, and nothing further than this was inferable from the language of the check. The check, by its terms, authorized the defendant to withdraw from the People's Bank a certain sum for a purpose not disclosed, but fairly inferable from the nature of the defendant's business.

" The defendant could have refused to receive the deposit, or act as Dr. Sims' agent in transferring the funds from one custodian to another; but having accepted the office of so doing, it was bound

to keep Dr. Sims' moneys, until it received his directions to pay them out. The language of the check making the funds payable only upon the order of the defendant imposed upon it the duty of seeing that they were not, through its agency, improperly disbursed after it had received them. They could not safely pay out such funds except under the direction of their lawful owner."

In the *Sims* case the defendant bank attempted to take advantage of a power of attorney which had been granted to Crowell twelve years before and which was in the possession of the People's Bank. The defendant did not act in reliance upon that power of attorney nor did it know anything about it. The court held that the power did not in fact authorize Crowell to withdraw the deposit and it was held that there was no defense to the claim for the return of Dr. Sims' money.

In the present case there is no claim that Parkman had any actual authority whatsoever to give instructions as to the ultimate disposition of the moneys that were payable to the Chemical Bank on behalf of the plaintiff. No course of business was shown from which it could be inferred that the plaintiff was in the habit of transferring funds to the Mission's account. We think that the usual doctrines of " holding another out " as one's agent having apparent authority, have no application to a case such as this where the defendant asked no question but merely assumed that the deposit slip presented with the check represented the plaintiff's *bona fide* instructions as to the disposition of the proceeds.

There is testimony in the record that in respect to both the $5,000 check and the $21,000 check, Parkman wrote on the checks " Credit to the order of Midnight Mission " and that he wrote these words after Donald had signed the checks. As far as the $5,000 check is concerned, a photograph of the face of the check was taken by the Hanover National Bank. A photostatic print is in evidence and it is quite obvious that there was nothing on the face of the check indicating that it was to be credited to the account of the Mission. Accordingly, any testimony by Parkman to that effect is conclusively contradicted by the exhibit. No photograph of the $21,000 check was taken by the Chemical Bank. The check was destroyed and we are unable to determine at this time by real evidence whether Parkman indorsed anything on the front of the check which would indicate a payee other than Chemical Bank. We believe that since his testimony was false as to the $5,000 check, he should be disbelieved as to the $21,000 check, if the existence or non-existence of the notation is relevant.

We wish to say as further confirmation of our finding of fact in this regard that the testimony of Parkman in this record is

subject to the utmost suspicion because Parkman maintained throughout that he was stealing this money to restore it to the Mission at the expense of the plaintiff. The discovery by the plaintiff of his other defalcations was imminent and it was his choice that loss should fall upon the plaintiff and not upon the charitable corporation defendant, of which he had been a trustee. Accordingly, it might well be expected that even when he confessed his misdeed he would state facts which he would hope would prevent the undoing of his wrong to the detriment of the Mission.

It is urged by the Chemical Bank that the alleged writing is relevant because if made it would constitute a material alteration by changing the payee. It would, therefore, amount to a forgery in law and would enable the bank to set up the one-year Statute of Limitations provided by section 326 of the Negotiable Instruments Law. To dispose of this point at this time, we find as a fact that the notation was not on the face either of the $21,000 check or of the $5,000 check. It may have been on the reverse side of both checks, though there is no evidence to support the conjecture. In any event, the notation did not constitute in law an alteration of the name of the payee and at most was a suggestion not over the signature of the drawer which may have misled the Chemical Bank but which in no wise estops the plaintiff from suing for the diversion of the check or excuses the Chemical Bank from a failure to inquire as to the disposition of the proceeds which had been paid over to it.

Moreover, section 326 of the Negotiable Instruments Law has no application to the sort of notation claimed to have been written on the check. The act speaks of a " forged or raised " check, showing that the Legislature had a narrow definition of forgery in mind and not one that would include all alterations. The latter interpretation would make the word " raised " superfluous. (See discussion in *North British & M. Ins. Co.* v. *Merchants' Nat. Bank*, 161 App. Div. 341, 355.)

The situation presented in the case then after analysis is a very simple one in which a bank having come into possession of funds and having received no proper instructions as to their disposition, gives the money to a depositor not entitled thereto. This is a plain though innocent conversion for which the bank is obviously liable and we think that the bank is equally liable to the plaintiff on both checks and that judgment should be directed accordingly.

The question of the right of the bank to a judgment over against the Mission depends, it seems to us, upon the interpretation which is put upon Judge O'BRIEN's opinion in the *Aneless Case* (*supra*). The Court of Appeals in the excerpt quoted seems to hold that the defendant in that case would have been liable for the act of the

collecting bank if the bank were aware of any infirmity in the check. In that case there was no infirmity in the check which would put the agent on notice. In the present case, while there was no infirmity in the check, the most that the check did was to give the money to the Chemical Bank. The Chemical Bank chose to assume that a claimed notation on the back (if there were such) and the deposit slip truly stated the wishes of the drawer. In this they were mistaken and innocently converted the proceeds. We think that the act of conversion, even though innocent, must be imputed to the principal. If the principal itself were substituted for the Chemical Bank and money not properly earmarked came into its possession, it could not retain it on the discovery that it was not intended for itself.

On this appeal the Mission tacitly recognized that it must restore the $21,000 to Matteawan if it erroneously received that money by the Chemical Bank's mistake in crediting it with the deposit. It takes the position, however, that the fruit of Parkman's fraud on its behalf was not accepted by it until Gawtry, an innocent director, checked the substituted bonds in the vault. That moment, says counsel for the Mission, was the moment when restoration took place. Everything up to that time had been done without the knowledge or consent of the Mission and by analogy to the decision in the *Aneless* case, it is claimed that Gawtry's act was an act of an innocent agent accepting restitution from a wrongdoing agent who up to that moment had been acting in his own behalf.

While there is a certain superficial resemblance between the facts in the instant case as thus construed and those which were interpreted by the Court of Appeals in the *Aneless* case, we think there is a vital difference. In the instant case, in view of the decision in the *Credit Alliance Case* (*supra*) the Mission can escape the consequences of restoring the $21,000 only by claiming that it never consented to be a debtor therefor. When, however, it appears that after credit for the deposit was given to the Mission, its own agent, Parkman, even though a wrongdoer, gave instructions to Henderson & Company to buy $21,000 worth of bonds and received those bonds and restored them to the Mission's vault, it must be then held that the final acceptance of the bonds by the Mission amounts to a ratification of its agent's act in giving the orders to Henderson & Company and paying for the bonds and in accepting them. To this extent, at least the decisions in *Holden* v. *New York & Erie Bank* (*supra*); *Martin* v. *Gotham National Bank* (248 N. Y. 313); *Atlantic Mills* v. *Indian Orchard Mills* (147 Mass. 268; approved in *Clarke* v. *Rogers*, 228 U. S. 534, 549) and in *Curtis Co.* v. *United States* (262 id. 215) and cited in *Whiting* v. *Hudson*

*Trust Co.* (234 N. Y. 394) must express the law of the State. Accordingly, we hold that there is no substance to the attempt to distinguish between the receipt of the $21,000 and the final receipt of the bonds.

Perhaps a word is necessary to dispose of two other defenses set up in avoidance of liability by the Chemical Bank. The first is that there is an account stated between the parties as to the $21,000 check. The confirmations of monthly statements which were signed by Francis T. Henderson, one not a party to Parkman's fraud, which are relied upon by the Chemical Bank, are dated, respectively, May 4, 1932, and sometime after April 29, 1933. The $21,000 check was dated February 10, 1932. The bonds were purchased February 16, 1932, so that most of the $21,000 was withdrawn from the bank before any account stated could have arisen. The remainder is still there. There is, therefore, no proof of any reliance to the bank's detriment on the acknowledgment of the correctness of the account. An account can always be opened and corrected if the party affected has not acted to its detriment in innocently relying thereon. It is not shown that at any time the bank could successfully have recouped its losses from Parkman. Since, too, Parkman consummated the purchase of the bonds before any account stated was received, the Chemical Bank cannot claim that it was prevented by the receipt of the acknowledgment from stopping payment on the Mission's account. There being no estoppel *in pais* the alleged acknowledgment of the correctness of the account is no defense. (See *Lockwood* v. *Thorne,* 18 N. Y. 285; *Hopwood Plays, Inc.,* v. *Kemper,* 263 id. 380.) Moreover, in any event, the defense was not pleaded.

The other defense set up by the Chemical Bank is that the loss was caused by plaintiff's negligence in drawing the check. There was nothing negligent in drawing a check to the order of the Chemical Bank. It was done under a misapprehension of fact and nothing further was accomplished than to transfer the title of certain funds to the Chemical Bank itself. Plaintiff owed no duty to the Chemical Bank to report the diversion of the $5,000 check (*City of New York* v. *Bronx County Trust Co.,* 261 N. Y. 64, 70) and no damage was shown by any negligence after the event. (*National Surety Co.* v. *Manhattan Co.,* 252 N. Y. 247.)

The Chemical Bank is not entitled to judgment over against the Mission in relation to the $5,000 check because the Mission neither consented to be a debtor by that amount nor in fact received the proceeds. But since the Mission undoubtedly received the proceeds of the $21,000 erroneously credited to its account, the Chemical Bank is entitled to judgment over against the Mission for $21,000 provided it satisfies the judgment due plaintiff.

The judgment in favor of the Chemical Bank and Trust Company and against the plaintiff should be reversed, with costs, and judgment should be directed in favor of plaintiff against the Chemical Bank and Trust Company for $26,000, with costs. The judgment in so far as it dismisses the complaint over of defendant Chemical Bank and Trust Company against the defendant The Midnight Mission should be modified by directing judgment over against The Midnight Mission in favor of the Chemical Bank and Trust Company for $21,000, with costs, provided the Chemical Bank and Trust Company pays the judgment due the plaintiff, and as so modified that part of the judgment should be affirmed.

MARTIN, P. J., O'MALLEY and GLENNON, JJ., concur.

Judgment modified as indicated in opinion and as so modified affirmed. Settle order on notice.