**William D. PETTIT and Thomas J. Crawford, Trustees-Appellants,**

v.

**DOESKIN PRODUCTS, INC. and Keta Gas & Oil Company, Appellees.**

**No. 244, Docket 25437.**

United States Court of Appeals Second Circuit.

Argued Feb. 11, 1959.

Decided Aug. 24, 1959.

Rehearing Denied Oct. 13, 1959.

See 270 F.2d 699.

L. Hand, Circuit Judge, dissented.

George C. Levin and Milton Kunen, New York City (James T. Sherwin, Joseph J. Moscou and Kaye, Scholer, Fierman, Hays & Handler, New York City, on the brief), for trustees-appellants.

I. Z. Nathanson, New York City (Samuel Aleyner, Gerald Kahn and McCarthy, Kapelman & Nathanson, New York City, on the brief), for appellees.

Thomas G. Meeker, General Counsel, David Ferber, Asst. General Counsel, Securities and Exchange Commission, Washington, D. C., for Securities and Exchange Commission.

Before HAND, Circuit Judge, MADDEN, Judge, United States Court

of Claims,* and LUMBARD, Circuit Judge.

LUMBARD, Circuit Judge.

The trustees in a Chapter X, 11 U.S.C.A. § 501 et seq., reorganization of Swan-Finch Oil Corporation applied to the District Court for the Southern District of New York for an order directing Doeskin Products, Inc. and Keta Gas & Development Company to turn over to them a certificate for all the outstanding stock of Keta, namely 1,140,390 common shares, and all of its assets, which they claim is the property of Swan-Finch.

The basic facts are virtually undisputed. Lowell M. Birrell who dominated Swan-Finch and the three other companies involved, caused the name of the registered owner, "Swan-Finch Oil Corporation," to be altered by striking "Oil" and typewriting over it the words "Gas Development." A similar alteration in handwriting was made on the certificate stub. Thereafter by treating the subsidiary Swan-Finch Gas Development Corporation as owner of the stock, by causing an unauthorized agreement for the exchange of stock to be executed between Gas Development and Doeskin and by causing the issuance of 700,000 shares of Doeskin stock to Gas Development which Birrell then had Gas Development's president hand over to him, Birrell has availed himself of the proceeds and Doeskin has become the registered owner of the stock.

The trustee's claim derives from the contention that the debtor never authorized the transfer of the Keta shares to the Doeskin company or to its own wholly-owned subsidiary, Gas Development, but that such transfer as was purportedly made was carried out by a fraudulent agent of both companies, Lowell M. Birrell. The trustees contend that Judge Palmieri erred in holding that they may recover the shares transferred by Birrell only if they restore to Doeskin the shares it issued to Birrell. We hold that the transaction by which the Keta shares were transferred to Doeskin was entirely without authorization; that the receipt by Gas Development's president did not constitute receipt by the debtor of the Doeskin stock, and that therefore the debtor may recover the Keta shares from Doeskin without returning the shares given up by Doeskin in receiving them.

▆ Birrell's domination of the four companies which he accomplished through Mary B. Prior, his sister, Roy H. Callahan and others, is conceded. Apparently Birrell made and unmade directors and officers pretty much as he saw fit. The salient facts regarding the four dominated companies during the times in question may be briefly stated:

Swan-Finch Oil Corporation (Swan-Finch), a New York corporation with offices at 41 East 42nd Street, New York, was both a holding and an operating company, with 6,000 stockholders and assets of about $12,000,000. Its stock was traded on the open market. Until October 1, 1956 Birrell was a director and the principal executive officer and after that date he was also treasurer. Callahan was a director, a vice-president, and for a time in 1957 he was president. Mary Prior was a director, vice-president and secretary.

Swan-Finch Gas Development Corporation (Gas Development), a Pennsylvania corporation wholly-owned by Swan-Finch, had New York offices at 545 Fifth Avenue where Birrell's law office was located, three short blocks away from 41 East 42nd Street. Birrell was a director, Callahan was a director and president and Mary Prior was a director, vice-president and secretary.

Keta Gas & Oil Company, a Pennsylvania corporation, was engaged in developing and drilling gas wells principally in western Pennsylvania. While it maintained offices at Bradford, Pennsylvania, its executive offices, at least after September 27, 1955, were at 41 East 42nd Street. Keta's assets were carried at about $4,000,000 at the time it was ac-

---

* Sitting by designation pursuant to the provisions of 28 U.S.C. § 291(a).

quired by Swan-Finch in September 1955 and at $6,800,000 at the end of 1956. After Keta's acquisition Birrell became a director and the principal executive officer, Mary Prior became a director and secretary, and Callahan became a director and sometime later became president.

Doeskin Products, Inc., a New York corporation engaged in the manufacture and sale of paper products, also had its offices at 41 East 42nd Street. Doeskin had numerous stockholders and its stock was traded on the open market. Birrell was a director and the principal executive officer of Doeskin, Callahan was a director and president for a time, and Mary Prior was a director and secretary.

On September 27, 1955 Swan-Finch acquired all the outstanding 1,140,390 shares of Keta common stock and there was issued to it certificate No. 2 for those shares.

During the last few days of December 1956 Birrell's manipulations bore fruit and he secured possession of 700,000 shares of Doeskin's stock in return for the Keta stock. Although Birrell, his sister, Mary Prior, and Callahan were the three principal actors in the transactions, only Callahan was available as a witness. Sometime about September 1957 Birrell went to Cuba where he was later joined by his sister, Mary Prior, and these two concededly have been evading the jurisdiction of our courts. But the main events and the inferences to be drawn therefrom seem beyond dispute.

On December 28, 1956 Birrell presented to a meeting of the Doeskin directors what purported to be a contract between Gas Development and Doeskin for the exchange of all the Keta stock in return for 700,000 shares of Doeskin stock. The contract was signed by Callahan for Gas Development and by Birrell for Doeskin on or about December 25, although it was dated October 5, 1956 and provided for a closing on November 15. Callahan testified he first heard of the proposal late in December and that he had not known that Keta had been transferred from Swan-Finch to Gas Development.

The Doeskin directors not dominated by Birrell had never heard of the contract and they objected. Three of them, Emanuel Katz, Harry Troilin and Alexander Blumenthal, immediately resigned. A fourth, Robert Six, left the meeting, and a fifth, William Erb, testified that he did not approve. As a quorum was no longer present the meeting was adjourned to December 31. The respondents produced alleged minutes which purport to show that the meeting was postponed to December 31, and December 31 minutes which purport to show that three directors were then present, Birrell, Callahan and Joseph Crosby, also Comptroller, and they recite approval of the contract at that meeting. Doeskin's president, Ralph Damp and directors Edward G. Brown and William Erb were never notified. Judge Palmieri's finding that no December 31 meeting ever took place is clearly right.

Birrell also caused the fabrication of minutes of a Swan-Finch directors' meeting of January 4, 1956, and of a Gas Development directors' meeting of January 26, 1956, which minutes record the approval of the transfer of the Keta stock from Swan-Finch to its subsidiary Gas Development. But it is abundantly established that no one, aside from Birrell and Mary Prior, had any inkling that Keta was no longer a subsidiary of Swan-Finch. It is clear from the record that the alleged Swan-Finch meeting of January 4, 1956 and the alleged Gas Development meeting of January 26, 1956 never took place.

On December 31, 1956 Birrell and Callahan went to the 29 Broadway office of the Manufacturers Trust Company, Doeskin's transfer agent, to secure the issuance of the 700,000 Doeskin shares pursuant to the spurious contract. Birrell in the additional capacity as counsel to Doeskin gave his written opinion of the corporate regularity of the transaction and stated that the transaction was "for investment and no public offering is involved." Thereupon the bank issued seven certificates each for 100,000 shares of Doeskin common stock which were

given to Callahan, president of Gas Development, who, at Birrell's request immediately handed them over to Birrell before they left the bank.

Apparently the altered certificate No. 2 for the Keta shares was turned over the same day, December 31, to Doeskin and, although it was never endorsed by anyone on behalf of Gas Development, Keta issued certificate No. 3 to Doeskin for 1,140,390 shares, dated December 31, 1956, and signed by Mary B. Prior as secretary and Callahan as president.

Sometime in January 1957 Callahan, as president of Gas Development, executed stock powers in blank at Birrell's request. From January 8 to March 28, 1957 the seven certificates for the Doeskin shares found their way to brokers in Canada. Thus except for Callahan's momentary token possession, as to which he was in no way authorized by the directors of Gas Development, there is no evidence that Gas Development ever received the Doeskin shares. Likewise there was no attempt to show that Callahan was authorized to execute the stock powers.

The first question presented by these facts is whether the debtor authorized the transaction by which the Keta shares were transferred to Doeskin, and at the forefront of this question is the problem of which company, the debtor or its wholly-owned subsidiary, Gas Development, ought to be regarded as the shareholder. In the view we take of the case this preliminary question is not decisive, since in any event no greater authority existed for the transfer from the debtor to Gas Development than for the transfer to Doeskin, and in our view of the case the governing defect flows from the second transfer. We will therefore regard the debtor as the Keta shareholder, and direct our attention to the question whether it authorized the transfer to Doeskin.

Judge Palmieri expressly found on disputed evidence that there was no directors' meeting of the debtor with regard to the transfer of Keta shares, and that three of its six directors had no knowledge whatever of the dealings of Birrell

and his cohorts with the stock. He appears nevertheless to have concluded that Birrell's conceded domination of the affairs of all the corporations concerned was a satisfactory substitute for such authorization. We think the law of New York, the state of incorporation of both transferor and transferee, is to the contrary.

Under the law of New York mere "domination" of a board of directors is not the equivalent of the assent of the board in cases where such assent is a legal condition of the transaction. See Manson v. Curtis, 1918, 223 N.Y. 313, 322–323, 119 N.E. 559; McQuade v. Stoneham, 1934, 263 N.Y. 323, 189 N.E. 234; Long Park, Inc. v. Trenton-New Brunswick Theatres Co., 1948, 297 N.Y. 174, 77 N.E.2d 633.

Nevertheless the question remains whether the transaction was within the implied authority of Birrell, acting as president, without the assent of the directors. The law of New York on this question appears substantially unchanged since this court's decision in Schwartz v. United Merchants & Manufacturers, Inc., 2 Cir., 1934, 72 F.2d 256, where we held that such authority exists only as to matters which are "usual" or "ordinary," and that the burden rests upon the party challenging the president's authority to show that the transaction was "unusual" or "extraordinary." What is usual or ordinary necessarily depends on the circumstances of the particular case, and in the circumstances here presented there can be no doubt that the transaction was extraordinary. Before the transaction took place Doeskin, an operating company, had 470,000 shares outstanding, of which the debtor held about 200,000, or about 40%. Had the transfer been properly carried through the debtor would then have held 900,000 of a total of 1,170,000 shares of Doeskin, or about 77%. For such an increase in its ownership of Doeskin, the debtor surrendered the Keta shares, of an estimated worth of approximately $6,800,000, or about one-half of the assets of the debtor. As to such a transaction it is clear that no authority existed by implication or appear-

ance in a single corporate officer. Accordingly the transfer of the Keta shares was an entirely unauthorized transaction, and the issuance of Keta certificate No. 3 to Doeskin did not make it any more the shareholder of Keta than if it had been issued by a stranger.

We assume for purposes of this decision that as a result of the unauthorized nature of the transfer purportedly made by the debtor, it can recover the Keta shares from Doeskin, but that it can recover them only if it tenders back to Doeskin such benefit as it has received from the carrying out of the transaction. The question whether such a tender back is required in the present circumstances is not without considerable difficulty, e. g. compare United States Fidelity & Guaranty Co. v. Newburger, 1933, 263 N.Y. 16, 188 N.E. 141, with, Appleton v. Citizens Bank, 190 N.Y. 417, 421, 83 N.E. 470, 32 L.R.A.,N.S., 543, affirmed 1909, 216 U.S. 196, 30 S.Ct. 364, 54 L.Ed. 443; Losie v. Ken-Vic, 3rd Dept. 1943, Sup., 43 N.Y.S.2d 914, affirmed 266 App.Div. 1045, 44 N.Y.S.2d 473; Eisen v. Post, 1 A.D.2d 344, 149 N.Y.S.2d 864, reversed on other grounds, 1957, 3 N.Y.2d 518, 169 N.Y.S. 2d 15, but it need not be decided here in view of our decision of the ultimately decisive question of whether or not the debtor received the Doeskin shares surrendered by the transfer agent.

█ Two New York cases establish that Callahan's receipt of the Doeskin certificates from the transfer agent did not amount to their receipt by the debtor. In the first the Court of Appeals held that an action for money had and received would not lie against a corporation whose agent had procured the plaintiff's check made out to the corporation, deposited it to the corporate account, and then made a withdrawal for his own benefit. Although the corporate accounts had thus been employed by the corporate president to secure the plaintiff's funds it was held that no receipt on the part of the corporation resulted because of the absence of corporate authorization and corporate knowledge of the transaction. Credit Alliance Corp. v. Sheridan Theatre Co., 1925, 241 N.Y. 216, 149

N.E. 837. In the second the operative facts were substantially the same. Matteawan Mfg. Co. v. Chemical Bank & Trust Co., 1 Dept. 1935, 244 App.Div. 404, 279 N.Y.S. 495. The facts in the instant case differ only in the respect that in order to effect the transfer of the Doeskin shares Birrell had to command the assistance of Callahan. Since it amply appears that throughout Callahan was duped by Birrell and acted in effect as his alter ego, we do not think this a sufficient ground of distinction. We conclude therefore that mere possession of the Doeskin shares by Birrell or his confederates did not, under New York law, constitute the debtor a possessor of the shares.

Accordingly we hold that the debtor may recover the Keta shares without tendering back to Doeskin the shares with which Birrell apparently absconded, and therefore the decision below is reversed.

L. HAND, Circuit Judge (dissenting).

The Keta shares had been validly issued, but they were never transferred to Doeskin Products Inc. Birrell, who was throughout the *deus ex machina* of the whole fraud, was not even president of the debtor, which was the registered shareholder of the shares. A majority of the debtor's directors had never agreed to their sale. The change on the face of the Keta certificate did not affect the debtor's rights in any way whatever; any subsequent transaction under the name of "Gas Development Company" was of as little legal significance as though it had been in the debtor's own name. Therefore I agree with my brothers that Doeskin Products Inc. never became assignee of the Keta shares; it was not even a bona fide holder of the certificates. Nevertheless a certificate was issued for the shares in favor of Doeskin Products Inc., and I agree that the debtor is entitled to a cancellation of that certificate and to a new certificate which will be evidence of its right.

However, the transaction was in the form of an exchange and certificates were issued for 700,000 new shares of Doe-

skin Products Inc. in favor of "Gas Development Company" and these certificates were delivered to Callahan, the president of "Gas Development Company." The issue of these new shares was also unauthorized and invalid, just as the transfer of the Keta shares to Doeskin Products Inc. The question therefore arises whether the debtor's claim can be enforced except as a rescission of the exchange by restoring Doeskin Products Inc. to its former position. It is the law of New York that after such an exchange restoration by either party presupposes a return by the claimant of the consideration received; and this is true, not only when the transfer was unauthorized by the corporation's officials, as here, but when it was *ultra vires*. Vought v. Eastern Building & Loan Association, 172 N.Y. 508, 517, 518, 65 N.E. 496; Appleton v. Citizens Central National Bank, 190 N.Y. 417, 83 N.E. 470; 216 U.S. 196, 30 S.Ct. 364; Losie v. Ken-Vic, 43 N. Y.S.2d 914, 916, affirmed 266 App.Div. 1045, 44 N.Y.S.2d 473. This has also been the Federal doctrine, as appears in the often cited decision of the Supreme Court, Central Transportation Co. v. Pullman's Palace Car Co., 139 U.S. 24, 60, 11 S.Ct. 478, 488, 35 L.Ed. 55. Mr. Justice Gray there said of an *ultra vires* contract, "(i)n such case, however, the action is not maintained upon the unlawful contract, nor according to its terms; but on an implied contract of the defendant to return, or, failing to do that, to make compensation for, property or money which it has no right to retain. To maintain such an action is not to affirm, but to disaffirm the unlawful contract." For this reason the debtor may disaffirm the exchange and reclaim the Keta shares only on condition that it restores Doeskin Products Inc. to the equivalent of its position before the transfer.

The Doeskin certificates were delivered to Callahan, the president of "Gas Development" and it was by means of them, endorsed by Callahan that Birrell procured the certificates that he sold to third persons and embezzled the purchase money. Again it appears that under the law of New York the buyers got a good title to the shares in spite of the invalidity of their issuance. Fifth Avenue Bank of New York v. Forty-Second Street and Grand Street Ferry Co., 137 N.Y. 231, 33 N.E. 378, 19 L.R.A. 331; Jarvis v. Manhattan Beach Co., 148 N.Y. 652, 43 N.E. 68, 31 L.R.A. 776, cited with approval in Benenson v. National Surety Co., 260 N.Y. 299, at pages 303–304, 183 N.E. 505, at page 506, 85 A.L.R. 79.

The debtor replies that all these steps were a part of Birrell's fraudulent scheme and that of course is true.

The only issue between my brothers and me, so far as I can see, is whether the Doeskin shares were delivered to the debtor or to Birrell, for if they were delivered to Callahan it makes no difference that Birrell "dominated" him. Concededly the certificates for the 700,000 shares were delivered to Callahan, and, although it was in the name of the "Gas Development" company, that was the same as though it had been in the debtor's name. Indeed, Callahan was himself vice-president of the debtor at the end of 1956 when the delivery took place. I cannot therefore agree that the delivery, which was intended to be in conformity with the contract, was to Birrell, whatever were his purposes. For that reason it seems to me that the case at bar falls within the decisions I have cited which hold that the injured party may not reclaim property unlawfully procured from him unless he restores any consideration he may have received.

My brothers rely upon the decision of the New York Court of Appeals in Credit Alliance Corp. v. Sheridan Theatre Co., 241 N.Y. 216, 149 N.E. 837, as showing that the debtor never became so possessed of the Doeskin shares as to make their restitution a condition upon its recovery of the Keta shares. In the decision they cite the defendant corporation had by resolution provided that it should not borrow money except when authorized by the signatures of its president, Spiegel, and its treasurer, Rafferty. Spiegel drew up five notes which he signed as president

and to which he forged Rafferty's name; hence they were not in fact obligations of the defendant at all. These five notes Spiegel then transferred to the plaintiff together with a certificate for 100 shares of the defendant's stock. In exchange the plaintiff gave "to Spiegel or some one representing him a check * * * payable to the order of the defendant corporation. This check Spiegel had certified and then he deposited it in a bank to the credit of the defendant. Almost immediately thereafter he drew a check of the defendant payable to his own order for the amount deposited, again forging the name of Rafferty. This check he deposited in a bank to his own credit." The Court of Appeals dismissed the plaintiff's complaint for "money had and received" for the following reasons among others. "The money, having been immediately withdrawn by Spiegel and converted to his own use without the corporation's knowledge of the transaction or that the funds had ever been placed to its credit, it enjoyed no benefit and exercised no dominion over the same."

In the case at bar both the transfer of the Keta shares to Doeskin and the issue of Doeskin shares to the debtor, *sub nomine*, "Gas Development," were invalid, not being executed by the only persons authorized by either corporation to make them. The only difference between the two is that Doeskin kept the Keta shares, and the debtor disposed of the Doeskin shares. If the debtor had not done so, the debtor would certainly have been obliged to restore the Doeskin shares as a condition upon the recovery of the Keta shares since the transaction was an exchange, and a party seeking to rescind an exchange must restore the consideration or its equivalent. It is true that the Doeskin shares were sold and the proceeds were apparently embezzled by Birrell; but that cannot disguise the fact that they were issued to the debtor with the active connivance of other of the debtor's officials, and had become as much a part of its assets as the Keta shares are part of Doeskin's assets. Hence it follows that the proceeds of those shares are as much the property of the debtor as the unsold Keta shares are property of Doeskin. Credit Alliance Corp. v. Sheridan Theatre Co., supra (241 N.Y. 216, 149 N.E. 837) depends, I think, upon the fact that Spiegel's transactions were not to be imputed to the defendant because no official of the defendant was privy to them at any stage. We should, I think, impose upon the debtor as a condition of any recovery the nearest possible equivalent of a cancellation of the newly issued Doeskin shares. As my view is not to prevail I shall not attempt to consider what should be deemed such an equivalent and indeed the parties have not discussed this aspect of the case. Therefore, although I would affirm the order so far as it directed a retransfer to the debtor of the Keta shares, I would make it conditional upon what the district court finds to be the nearest equivalent to cancellation of the Doeskin shares.