Arnold L. Fein, J.
Plaintiff stockbroker sues to recover damages sustained as a result of the failure and refusal of Coraloc Industries, Inc. (Coraloc) to accept and pay for 3,500 shares of E. L. Bruce Co. (Incorporated) (Bruce) stock purchased by plaintiff, as a broker, at a price range of $19 to $19% per share on the morning of June 12, 1962, pursuant to instructions allegedly given by Edward M. Gilbert (Gilbert), over the telephone, to plaintiff’s customers’ man, Geist Ely (Ely), at approximately 9:45 a.m. that day to make such purchase for the account of Coraloc.
Coraloc’s defenses are that: (1) Gilbert was not authorized to place the order; (2) only Robert C. Leonhardt (Leonhardt) was authorized to do so; (3) Gilbert did not place the order on behalf of Coraloc, but only designated Coraloc as the purchaser later in the day, after the order had been wholly or partly eafecuted; (4) plaintiff cannot recover because its procedures in taking, recording and executing the order, violated the rules of the Securities and Exchange Commission and the rules of the New York and American Stock Exchanges.
Gilbert was neither an officer, nor a director, nor an employee of Coraloc. However, he was then president, director and owner of over 50% of the stock of Bruce, which owned over 80% of the stock of Coraloc. At that hour in the morning of that day, and prior thereto, Gilbert controlled and dominated both Bruce and Coraloc and their respective boards of directors, although some time later in the day the situation drastically changed.
At approximately midday or early in the afternoon, Gilbert was compelled to resign as president and director of Bruce. That afternoon his whereabouts were unknown. In the evening, he fled to Brazil. By the end of the day, the price of Bruce stock on the market had fallen to $15%. Trading in the stock was suspended the next morning and was not resumed for five months. Gilbert subsequently returned and pleaded guilty to an indictment arising out of his activities in Bruce stock, for which he was sentenced to a term in the Federal penitentiary. It is obvious that these events motivated defendant’s refusal to accept and pay for the stock and much of the testimony and argument on its behalf. It is equally obvious that they are irrelevant, except as they bear on credibility.
The determination must be made on the basis of what occurred that morning, prior to Gilbert’s resignation, flight and fall from grace. Some time prior to 10 a.m. that morning, Gilbert and *408 three of the five directors of Coraloc, Messrs. William A. Fio Rito (Fio Rito), president and director of Coraloc, Vincent De Sousa (De Sousa), director of Coraloc and vice-president of Bruce, and Irwin Polivy (Polivy), director of Coraloc and officer and director of Bruce, conferred. Coraloc then had available approximately $225,000 in cash, acquired in an acquisition, sale and lease-back transaction (the Sunset transaction). It was agreed that all or a substantial part of the cash would be used to buy 10,000 to 12,000 shares of Bruce stock on the market that morning, and that a Coraloc board of directors’ meeting would be held forthwith to adopt the appropriate resolution.
Both Coraloc and Gilbert desired that the purchases be made that morning. Gilbert’s purpose was to attempt to “ dry up ” the market for Bruce stock in a shaky market, which jeopardized Gilbert’s financial condition. He had pledged his Bruce stock to obtain funds, in connection with purchases of Celotex stock on margin, in an attempt to acquire control of Celotex and to effect a merger of Celotex and Bruce.
Coraloc’s purpose is revealed in the minutes of its board of directors meeting, which recite: (1) Fio Rito, president of Coraloc, and De Sousa, in his capacity as vice-president of Bruce, had negotiated the Sunset transaction on behalf of Coraloc, with the requisite consent, authorization and guarantee of Bruce, obtained through Gilbert; (2) the subject property had been pledged to Bruce as security for the balance due Bruce on Coraloc’s purchase from Bruce of 17,500 shares of Bruce stock, at $32 per share, used in acquiring the property; (3) the Sunset transaction, with the approval of Gilbert, “ was designed to provide Coraloc with funds to pay off the major part of the balance due to Bruce (4) the market on Bruce stock “ had reached a low of about $20 per share ”; (5) Coraloc “could buy in at that price and return to Bruce a good part of the shares (xxx) purchased at $32.00”; (6) Fio Rito had. obtained an opinion of counsel that 11 there was no impropriety in the purchase by Coraloc of Bruce stock in the open market for the purpose of hedging on its prior purchase of stock from Bruce ”; (7) Fio Rito had arranged with Leonhardt to handle the purchases of Bruce stock for Coraloc’s benefit.
Resolutions were set forth in the minutes, approving the sale and lease-back, subject to the consent and agreement of Bruce, and authorizing Leonhardt to purchase Bruce stock for the account of Coraloc “ at approximately $20.00 per share, to a sum not exceeding $180,000 ’ ’.
*409 Defendant relies on these recitals and the testimony of Fio Rito, De Sousa and Polivy to shoAv that Gilbert had no authority to place the orders on behalf of Coraloc. However, the minutes are not dispositive. The court finds that it was agreed and understood at the early morning conferences that Gilbert had authority to order the stock on behalf of Coraloc and that Gilbert had every reason to believe that the board of directors of Coraloc would adopt the necessary formal resolution to that effect. In addition to the 3,500-share order placed with plaintiff, Gilbert placed orders with two other brokers to purchase 2,500 shares each. These orders were also executed and are the subject of similar lawsuits in this court.
The conflicting testimony of Fio Rito, De Sousa and Polivy, that Gilbert agreed and understood that only Leonhardt would place the purchase orders on behalf of Coraloc, strains the bounds of credulity. It is inconceivable that Gilbert would have concurred in this course, or accepted the reasons now urged as the basis for the alleged designation of Leonhardt as the sole agent of Coraloc to make the purchases, namely that: (1) it would look better; (2) Leonhardt would be able to buy the stock at lower prices because of his knowledge of the market and because he had no dual loyalty; or (3) as stated in the minutes, “ Coraloc had no brokerage accounts and its officers were not well versed in stock trading.”
Obviously Gilbert hardly would have agreed to a procedure designed to delay or space the orders in such a manner as to take advantage of possible further drops in the market price. This would serve no purpose of Gilbert’s. He still controlled both Bruce and Coraloc and their boards of directors. As even the minutes of Coraloc’s board of directors meeting recognize, his consent was essential to Coraloc’s corporate purpose in buying the Bruce stock, which would be a fruitless exercise unless there was a commitment by Bruce through Gilbert that Bruce would accept its own stock, purchased in the open market at approximately $20 per share, in liquidation of Coraloc’s obligation to pay cash for the Bruce stock purchased by it from Bruce at $32 per share. It is significant that the minutes fixed the purchase price at “ approximately $20.00
As events later in the day demonstrated, it was essential to Gilbert’s financial survival, and perhaps to his staying out of jail, that the stock be bought as near to the opening of the market as possible and at prices which would support the market. He was not interested in a waiting game.
*410 Leonhardt was not present at the early morning conferences. It is not clear whether he arrived after the Coraloc board meeting or just as it was ending. Gilbert interrupted the meeting at least once, to determine whether the resolution had yet been adopted. The court finds he was not told that only Leonhardt could place the orders, although he was advised that Leonhardt would act as well as himself. Gilbert’s obvious concern was to insure that a corporate resolution be adopted so that the brokers could open the necessary accounts. Coraloc had no account with plaintiff or the other brokers, nor had it ever purchased or sold any stock through plaintiff or any other brokers. Leonhardt was not known to any of them as a representative of Coraloc. His own troubles with the SEC were known.
The orders to make up the 3,500 shares were executed by plaintiff between 10:04 a.m. and 11:24 a.m. that morning. The minutes of the Coraloc board of directors meeting, which was held in the offices which it shared with Bruce at 660 Madison Avenue, New York, N. Y., state that it took place at 9:45 a.m. Whether this time was set forth inadvertently or by design does not appear.
The testimony of Fio Rito, De Sousa and Polivy, 'who were present, is in conflict as to the time and duration of the meeting, although all finally agreed it did not take place until later in the morning. The waiver of notice of the meeting signed only by the absent director, who was out of the country, is undated. It is not without significance that the waiver is consistent with plaintiff’s version as to the amount of stock authorized to be purchased and not with that of the defendant. It does not appear when the waiver and the minutes were physically prepared. The inclusion of Leonhardt’s name in the minutes, as the person to make the purchases, suggests that the resolution may have been put in that form when it became apparent that Gilbert’s empire was collapsing. It would serve no useful purpose of Coraloc to buy or pay for any Bruce stock, for which it was not already irrevocably committed, after it became known Gilbert had been or was about to be deposed as president and director of Bruce. Leonhardt had purchased only 2,300' shares. Gilbert had purchased 8,500 shares. The prices were approximately the same, and within the range specified in the minutes.
The court finds that the meeting took place later in the morning, after Gilbert had placed the orders for the stock, based upon the prior conferences with the three directors. This was undoubtedly known to the directors at the time of their meeting. They probably also had intimations of Gilbert’s imminent troubles with the Bruce board of directors, scheduled to meet *411 that morning. As has been noted, De Sousa was an officer of Bruce and Bolivy was an officer and director of Bruce.
It is assumed that the purchase of Bruce stock was not a transaction in the ordinary course of business of Coraloc. Although it has not been established that the Coraloc board adopted a resolution authorizing Gilbert to place the orders or specifically ratifying the orders already placed by him, it is beyond dispute that the resolution adopted substantially conformed in material particulars with the orders placed by Gilbert and with his prior agreement and understanding with a majority of the directors. Can defendant escape liability for the purchase of an authorized quantity of stock, at an authorized time and at an authorized price, for a proper corporate purpose, because it has not been established there was a formal resolution designating Gilbert to place the orders'? Although no cases directly in point have been found, it must be concluded that Gilbert had authority to act for Coraloc under these circumstances, despite the fact that the formal resolution purported to designate only Leonhardt as agent to place the orders.
Unlike Pettit v. Doeskin Prods. (270 F. 2d 95, 99) and Schwartz v. United Merchants & Mfrs. (72 F. 2d 256), relied on by defendant, here there was not mere domination of the board. Gilbert did not act on his own presumptive authority as in the cited cases. Here there was informal and formal knowing assent by the board of directors to all the material aspects of the transaction. Such assent was coupled with an agreement and understanding with Gilbert, albeit made under his domination, bringing the case clearly within the ambit of section 26 of the Restatement, Agency 2d: 11 Authority to do an act can be created by written or spoken words or other conduct of the principal which, reasonably interpreted, causes the agent to believe that the principal desires him so to act on the principal’s account.” See Wen Kroy Realty Co. v. Public Nat. Bank & Trust Co. (260 N. Y. 84), an apparent authority case, where the facts did not bring the case within the Restatement rule, but where the views expressed indicate the Restatement rule .states the applicable New York law respecting implied authority, under appropriate circumstances, such as are here present.
Plaintiff’s customers’ man, Ely, testified that he inquired of Gilbert whether the latter was authorized to act for Coraloc that morning and that Gilbert assured him of such authority. It is hardly likely that an inquiry in this form was made by Ely, in view of the relationship between the two, and Ely’s knowledge of Gilbert’s problems that morning. Undoubtedly *412 he noted the need for a corporate resolution by Cdraloc in order to open the new account and was advised by Gilbert of the impending meeting of the Coraloc board for that purpose, and the court so finds. This was a sufficient placing of the order on behalf of Coraloc.
However, it is patent that the name of Coraloc as the purchaser of the stock was not placed on the various internal documents maintained by plaintiff, as required to record the order and purchases, until substantially later in the day than the time the order was taken, placed and executed. It is also undisputed that no general partner or officer of plaintiff approved the opening of the Coraloc account or assured himself of Gilbert’s authority to enter the orders.
This procedure violated the Rules of the Securities and Exchange Commission (rule 17a-3[a] [6]) and the rules of the American (rules 153 and 411) and New York Stock Exchanges (rules 405 and 410). However, this provides no defense.
It is now well established that many of the sections of the Securities and Exchange Act of 1934 (48 U. S. Stat. 881; U. S. Code, tit. 15, § 78a et seq.) create by implication private causes of action on behalf of those damaged by violations of the act or of the rules of the Securities Exchange Commission and the stock exchanges adopted pursuant thereto (Remar v. Clayton Securities Corp., 81 F. Supp. 1014; Colonial Realty Corp. v. Bache & Co., 358 F. 2d 178). However, proof of the mere violation of the statute or the rules does not necessarily import liability or provide a defense. (Billings Assoc. v. Bashaw, 27 A D 2d 124; Myer v. Shields Co., 25 A D 2d 126; Nichols & Co. v. Columbus Credit Corp., 204 Misc. 848, affd. 284 App. Div. 870; Weis & Co. v. Offenberger, 31 Misc 2d 628.) As these cases hold, causally related damage must be shown. This is demonstrated in the two cases most heavily relied upon by the defendant. In Moscarelli v. Stamm (288 F. Supp. 453, 458-460) the court denied defendant summary judgment, holding that a cause of action was stated requiring a trial, but noting that the relationship of the parties and the effect of a rise in the purchase price of the stock involved were pertinent matters for inquiry upon the trial in order to determine whether the violation of the rules resulted in damage.
Buttrey v. Merrill, Lynch, Pierce, Fenner & Smith (410 F. 2d 135), was an action brought by the trustee in bankruptcy for a securities dealer against a brokerage firm, founded upon the broker’s alleged knowledge that the dealer was using fraudulently converted property of its customers in transactions *413 with the defendant. In denying defendant’s motion for summary judgment, the Court of Appeals stated (pp. 142-143): “ We do not decide that an alleged violation of Rule 405 is per se actionable [referring to New York Stock Exchange rule 405]. * * * Although mere errors of judgment by defendant might not support a federal cause of action, the facts alleged here are tantamount to fraud on the bankrupt’s customers, thus giving rise to a private civil damage action ”.
This is far different than the case sub judiee. Here, after trial, it is found that there is no basis for any claim of fraud resulting in damage to defendant. Defendant obtained precisely what it sought, stock purchases in a quantity and at a time and at prices which it had agreed to and wished to pay, for a proper corporate purpose. The fact that later events made the transaction unprofitable has no bearing on the events as they occurred. If there was a fraud, it may well have been inchoate in the failure of Gilbert, De Sousa and Polivy to recognize that their loyalty to Bruce raised serious questions as to their right to set up the transaction for the benefit of Coraloc as against Bruce. The transaction, if performed as planned, could not have injured Coraloc. It might have been to the detriment of Bruce.
The measure of damages is properly determined on the basis of the price at which plaintiff .sold the stock, under the circumstances here involved.
Judgment is granted in favor of the plaintiff against the defendant Coraloc Industries, Inc., in the sum of $27,159.22 together with interest thereon at 6% from June 12, 1962.