Vermont Mut. Ins. v. Sheehan . . .    CV-94-424-SD 01/15/97

UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF NEW HAMPSHIRE


Vermont Mutual Insurance Company

_____v.                                    Civil No. 94-424-SD

Sheehan, Phinney, Bass & Green, P.A.


O R D E R


This dispute arose out of payment by Vermont Mutual Insurance Company for the defense of its insured, Peterborough Savings Bank, against legal challenge to a foreclosure sale handled on behalf of the Bank by Attorney Daniel Sklar as a member of the law firm of Sheehan, Phinney, Bass and Green.


Background

The Bank held a mortgage on an automobile dealership business, Arista Chevrolet-Oldsmobile, Inc., that was owned and operated by one Giacalone. Giacalone subsequently filed for bankruptcy in the United States Bankruptcy Court for the District of New Hampshire. The Bank retained the Sheehan law firm to represent its interests as mortgagee of the Arista property in the Giacalone bankruptcy proceedings. Sheehan appointed Attorney Sklar to handle the Bank's case.

Acting as attorney for the Bank, Sklar obtained relief from the automatic stay under the Bankruptcy Code and conducted a foreclosure sale of Arista property in Peterborough, New Hampshire, on June 29, 1982. The Bank purchased the property at the foreclosure sale, and with the advice of Sklar prepared, filed, and recorded foreclosure deeds and supporting affidavits and statements as was required under New Hampshire law, Revised Statutes Annotated (RSA) 477:32. Sklar reported in those instruments that the Bank purchased the property for $404,000.

On November 30, 1983, Sklar wrote to the Bank asserting that the $404,000 purchase price in the recorded instruments was the result of a 'scrivener's error,' and that the Bank had actually only bid $69,000, which was the amount due the Bank on the Giacalone mortgage. Sklar then sent the Bank a "Corrective Foreclosure Deed" and a "Corrective Affidavit of Sale" to execute and record in order to correct the alleged error in the original instruments concerning the amount of consideration paid by the Bank. The Bank sent these corrective documents to their general counsel, Roderick Falby, for review.

Falby contacted Thomas Richards, a partner in the Sheehan law firm, to express concern about Sklar's request for corrective documents. After doing some investigation by speaking with Sklar, Richards reassured Falby that the matter was being handled appropriately and told him that "our office will stand behind our

2

work."  Then Richards instructed Sklar to send Falby a letter explaining more fully the reasons for requesting corrective documents.

This letter initiated back-and-forth correspondences between Sklar and Falby concerning the potential effects of and efforts to correct Sklar's alleged error in recording the purchase price paid by the Bank.  The meaning of these correspondences is an important source of contention between the parties.

On December 2, 1983, Falby wrote to Sklar:

> For the record, we disagree that there was a "scrivener's error" in the instruments.  The fact is that, on your advice, the Bank actually bid $404,000 at the sale.  This is a problem which has been previously brought to your attention.

> I have permitted the [Bank] to execute the corrective foreclosure deed and corrective affidavit of sale, and they are enclosed . . . .

> . . . [T]he bank expects you and your firm to accept responsibility for the results of the bid and improper instruments.  We will assume that you, by recording all instruments in the . . . Registry of Deeds, have consented to accept such responsibility.

Plaintiff's Objection, Exhibit A-1, at 1.

On December 6, 1983, Sklar responded that:

> . . . . [W]e do not anticipate the need for anyone to assume any responsibility for any potential claim arising from the improper instruments which were originally filed.  Nevertheless, as Tom Richards indicated to you during your telephone conversation, we fully intend to stand behind the services we performed on behalf of the [Bank] and, therefore, we will indemnify and

3

> defend them for any claims arising out of this
> situation.

Defendant's Motion for Summary Judgment, Exhibit A-1, at 2.

Almost three years after these correspondences, Giacalone, the Bank's mortgagor, brought suit against the Bank. Counts II and III of Giacalone's complaint regarded the amount of the Bank's bid at the foreclosure sale and the preparation, filing, and recording of false and fraudulent deeds, affidavits, and statements with respect to that sale.

Vermont Mutual, as the Bank's insurer, paid the costs of defending against Giacalone's claims, which amounted to nearly $200,000. The insurance contract between Vermont Mutual and the Bank provided,

> In the event of any payment under this policy the
> Company shall be subrogated to all the insured's
> rights of recovery against any person or
> organization and the insured shall execute and
> deliver instruments and papers and do whatever
> else is necessary to secure such rights.

Plaintiff's Motion for Summary Judgment, Memo at 3. The trial of the Giacalone actions began in 1992 in Hillsborough County (New Hampshire) Superior Court, Southern District, and ended with jury verdicts in favor of the plaintiffs. The Sheehan law firm contributed a portion of the money due to Giacalone, and, in return, the Bank executed a release of the Sheehan law firm for any legal claim the Bank may have had against Sheehan. However, the release provided that:

4

> It is acknowledged and understood that this
> Release in no way affects or limits the claims, if
> any, which the Bank's insurer, Vermont Mutual
> Insurance Company, may have against the Releasees
> and/or Daniel W. Sklar for the recovery of
> attorney's fees and disbursements relative to
> Vermont Mutual[]'s defense of the Bank . . . .

Plaintiff's Motion, Memo at 9.

Vermont Mutual brings a four-count complaint against the Sheehan law firm seeking to recover the amount expended in defending the Bank in the Giacalone proceedings. Count I alleges that Sheehan breached a contract formed between Sklar, on behalf of Sheehan, and the Bank, thereby entitling Vermont Mutual, as the Bank's subrogee/assignee pursuant to the insurance contract, to seek damages against Sheehan. Count II seeks specific performance of that contract. The complaint also asserts a claim premised on a theory of implied indemnity (Count III) and on a theory of restitution/quantum meruit (Count IV).

Sheehan seeks summary judgment on all four counts. Vermont Mutual seeks summary judgment on the issue of liability for Count I's breach of contract claim.

## Discussion

Under Rule 56(c), Fed. R. Civ. P., summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Vermont Mutual argues that it is entitled to summary

5

judgment on its breach of contract claim because, as a matter of law, a binding contract was formed between Sheehan and the Bank based on the contents of Sklar's letters to Falby. Vermont Mutual claims entitlement to pursue the Bank's breach of contract claim because the Bank was obligated under the insurance contract to assign its legal rights to its insurer, Vermont Mutual.

On the other hand, Sheehan argues that it is entitled to summary judgment on the breach of contract claim because (1) Sklar did not manifest the necessary contractual intent to defend the Bank in an action by the mortgagor Giacalone, (2) the Bank did not provide consideration to support any promise contained in Sklar's letter, (3) Sklar was not authorized to bind the Sheehan firm to that alleged promise, or (4) Vermont Mutual should not be permitted to pursue the legal rights of the Bank. If Sheehan demonstrates that any reasonable jury would find for Sheehan on any one of these four issues, then summary judgment in favor of Sheehan is appropriate. However, Vermont Mutual must show that any reasonable jury would find against Sheehan as to all four issues in order to support summary judgment in its favor.

For the reasons that follow, this court agrees with Vermont Mutual that Sheehan was bound by contract to indemnify and defend the Bank in the Giacalone action. Having failed to do so, Sheehan is liable, as a matter of law, to Vermont Mutual as

6

subrogee of the Bank's legal claims against Sheehan for breach of contract.

## 1. Manifestation of Contractual Intent

The parties dispute whether Sklar manifested the requisite contractual intent to indemnify and defend the Bank against claims brought by the Bank's mortgagor, Giacalone.

New Hampshire law applies the objective theory of contracts, under which language appearing plain and unambiguous on its face is taken at its plain meaning to express the intent of the parties. Echo Consulting Services v. North Conway Bank, 140 N.H. 566, 569, 669 A.2d 227, 230 (1995). Because meaning varies with context, the usefulness of the plain meaning rule runs out beyond a certain point in contract interpretation. So, "[i]n ascertaining intent, the language of the agreement is not completely dispositive . . . . Intent, therefore, should be determined not only in light of the instrument itself, but also in view of the surrounding circumstances." Rogers v. Cardinal Realty, Inc., 115 N.H. 285, 286, 339 A.2d 23, 35 (1975). If the language examined in light of the context of use is susceptible to more than one reasonable interpretation, the contract is deemed ambiguous. In such a case, the bar of the plain meaning rule is lifted, and extrinsic evidence is admissible to clarify the ambiguity.

7

Here, the contractual language is contained in a letter from Sklar assuring Falby that "we fully intend to stand behind the services we performed on behalf of the [Bank] and, therefore, we will indemnify and defend them for any claims arising out of that situation." Defendant's Motion for Summary Judgment, Exhibit A-1, at 2. On its face, the meaning of this language appears manifest; namely, a broad promise of indemnity attaching to "any claim." Under the plain meaning rule, Sheehan would be held to the terms of this broad promise. However, Sheehan seeks to avoid application of the plain meaning rule by offering an alternate interpretation that, according to Sheehan, is reasonable when the ambient light of context is shed upon the language. Sheehan urges that Sklar's letter could have the narrower meaning that Sheehan would indemnify and defend the Bank only against any of the property's junior lienholders that challenged the foreclosure in mortgagor Giacalone's bankruptcy proceedings. Basically, Sheehan argues "any claims arising out of that situation" does not mean "all claims," but rather only the subset brought by junior lienholders.

As the touchstone of contract interpretation under New Hampshire law is objective reasonableness, the question is whether the narrow meaning offered by Sheehan could occur to a reasonable person in Falby's position reading Sklar's letter. If not, then Sheehan will be held to the sole reasonable interpreta-

8

tion or plain meaning of the language as a broad promise of indemnity for "any claim." If, however, Sheehan's alternate interpretation is reasonable, the contract will be deemed ambiguous, and extrinsic evidence will be admissible for clarification.

However, this court finds that the narrower meaning offered by Sheehan is an unreasonable interpretation of the language of Sklar's letter to Falby. Since Sklar's letter referred generally to "any claim," a reasonable person reading the letter would conclude that Sklar meant all foreseeable claims arising out of the foreclosure sale. Otherwise, Sklar would have specifically referenced those claims that, while foreseeable, were not within the group of claims for which Sklar was willing to assume the risk. Or Sklar would have referenced the subset of the foreseeable class of potential plaintiffs included in the premise and, by implication, the reference would have excluded the rest. Without either an exclusionary or an inclusionary reference in the letter, a reasonable person would be left with the conclusion that "any claim" meant any foreseeable claim. The foreclosure sale conducted by Sklar for the Bank adjusted the legal rights of many interested parties, including not only the junior lien-holders, but also the mortgagee Giacalone. If the foreclosure sale was handled improperly, it was foreseeable that any of the interested parties, including Giacalone, would pursue legal

9

action against the Bank. Since Giacalone was within the foreseeable class of potential plaintiffs, Sklar's promise to "defend and indemnify for any claim" extended to action brought by Giacalone.

Next, Sheehan points to the fact that Sklar prefaced the "defend and indemnify" language with a reference to a previous conversation between Falby and Richards. Sklar's letter read: "[A]s Tom Richards indicated to you . . . we fully intend to stand behind the services we performed . . . and, therefore, we will indemnify and defend [the Bank] for any claims arising out of this situation." Defendant's Motion, Exhibit A-1, at 2. According to Sheehan, the reference would lead a reasonable person in Falby's position to understand that any promises contained in Sklar's letter were not meant to go beyond the scope of Richards' promises during the previous conversation. Richards made only vague promises to "stand behind our work," and the scope of Sklar's letter should be deemed no greater, according to Sheehan.

On the contrary, a reasonable person in Falby's position would draw only one conclusion about the meaning of Sklar's letter. The language clearly indicates an intent to go beyond the scope of Richards' promise. The letter reiterates Richards' vague promise to "stand behind our work," but continues, "therefore, we will indemnify and defend the [Bank]," indicating

10

Sklar's intent to clarify and give content to Richards' vague promises. That Sklar's promise goes beyond Richards' promise is clear; the only question is how much further does it go. There is nothing in the reference to Richards' promise that sheds light on the intended scope of Sklar's promise. For that reason, Sheehan cannot rely upon the reference to Richards' promise to narrow the plain meaning of Sklar's promise.

Since the narrow meaning proposed by Sheehan is unreasonable, this leaves the plain meaning of the letter as determinative of Sklar's contractual intent. Thus, the promise extends to "any claim" arising out of the foreclosure proceeding, including legal action brought by the mortgagor Giacalone.

2. Consideration

The next question is whether Sklar's promise is supported by consideration. Generally, promises unsupported by consideration are not legally enforceable. CALAMARI & PERILLO, THE LAW OF CONTRACTS § 4-1, at 132 (2d ed. 1977). Under New Hampshire law, "consideration may consist either in a right, interest, profit or benefit accruing to the promisor or a detriment to the promisee." Corning Glass Works v. Max Dichter Co., 102 N.H. 505, 512 (1960). Vermont Mutual contends that the Bank suffered the necessary detriment by signing the corrective instruments, sending them to the Sheehan firm, and allowing them to be recorded. In short,

the Bank suffered detriment by cooperating with Sheehan in correcting the errors in the original filings.

The parties dispute whether the Bank's cooperation can be properly characterized as detrimental. Vermont Mutual argues the cooperation was detrimental because the Bank was exposing itself to additional litigation risks should the filing of corrective documents lead to legal challenge to the foreclosure sale. Sheehan argues that the Bank's cooperation does not constitute detriment because the net result was a benefit accruing to the Bank. The original filing allegedly erroneously recorded a consideration paid by the Bank of substantially more than Giacalone's mortgage liability to the Bank. The property's junior lienholders would be entitled to claim against the Bank for the erroneous "surplus." Thus, the corrective filings benefitted the Bank by setting the record straight and dispelling the false impression that "surplus" was created at the fore-closure sale. The parties dispute whether cooperation resulted in a benefit or a detriment to the Bank's interests.

However, this dispute between the parties misunderstands the nature of consideration. Consideration simply consists of performance or a promise to perform an act that one is not legally obligated to perform or refrain or a promise to refrain from exercising a legal privilege to act. CALAMARI & PERILLO, supra, § 4-1, at 134. Under this standard, it is irrelevant that

12

the act constituting detriment, all things considered, advances the promisee's best interest and is thus beneficial. An act done in the face of a legal privilege to do otherwise constitutes detriment, regardless of whether the act inhibits or advances the promisee's overall interests.

Here, while possibly under an obligation to correct the defective filing, the Bank was not under any legal obligation to cooperate with Sheehan, and by doing so it suffered sufficient legal detriment.

The next element of consideration is whether the detriment is "bargained for" in exchange for the promise. "This means that the promisor must manifest an intention to induce the performance or return promise and to be induced by it, and that the promisee must manifest an intention to induce the making of the promise and to be induced by it." RESTATEMENT (SECOND) OF CONTRACTS § 81 cmt. a (1981). The detriment and the promise bear a reciprocal relation of inducement--the detriment induces the promise, and the promise induces the detriment.

Sheehan argues that the Bank's cooperation was not induced by Sklar's promise to "indemnify and defend." According to Sheehan, the Bank cooperated to decrease their exposure to litigation, and would have cooperated whether or not Sklar made the alleged promise. As evidence, Sheehan points to a letter from Falby stating: "I permitted [the Bank] to sign the revised

13

affidavit on the understanding that all parties . . . had agreed that the revised affidavit would solve the problem." Defendant's Objection, Exhibit B-1. Since the Bank would have cooperated, even in the absence of Sklar's promise to "indemnify and defend," the promise did not induce the detriment, and thus adequate consideration is absent (or so Sheehan argues).

However, for consideration to be found, the actions constituting detriment need not be motivated solely or primarily by the promise. "[T]he fact that a promise does not of itself induce a performance or return promise does not prevent the performance or return promise from being consideration for the promise." RESTATEMENT, supra, § 81(2), at 206. Consideration can be found where the promise is one of several motivating factors that caused the promisee to undertake the detrimental act, even if the promise was not the determinative motivating factor. CALAMARI & PERILLO discusses this example. "A is moved by friendship to sell his horse to B for $100,000. If there is an actual agreement to exchange the horse for the money a contract is formed even though A's primary motive in entering into the transaction was friendship." CALAMARI & PERILLO, supra, § 4-5, at 142.

Thus, the Bank could have been committed to cooperating with Sheehan regardless of whether Sklar promised to indemnify and defend the Bank. Nonetheless, Sklar's promise induced the Bank's

14

cooperation because the security of an indemnity promise from Sklar provided additional motivating force to the Bank's decision to cooperate by removing the element of risk from that decision. The promise provided the Bank one more reason to cooperate among several other reasons that may have been more compelling and even determinative.

The next issue is whether the timing of the detriment in relation to the promise said to induce it precludes a finding of consideration. The Bank's acts constituting detriment were executed before Sklar's promise was made. In his letter of December 2, 1983, Falby wrote: "I have permitted the [Bank] to execute the corrective foreclosure deed and corrective affidavit of sale, and they are enclosed . . . ." Plaintiff's Objection, Exhibit A-1. Sklar's promise was contained in a letter dated four days later on December 6, 1983. Thus, the Bank's acts of cooperation said to constitute detriment were fully executed before Sklar promised to indemnify and defend the Bank.

The general rule is that "past consideration is not consideration." CALAMARI & PERILLO, supra, § 4-2, at 135. Detrimental acts fully executed before the return promise was given could not have been induced by that promise. The detriment was already suffered, and a promise given later appears purely gratuitous.

15

However, the general rule is inapplicable in cases such as this where the promisee performs the acts constituting detriment under the express condition of receiving a return promise in the future. In his December 2, 1983, letter to Sklar, Falby indicated that the Bank had only cooperated because it "expected [Sklar and Sheehan] to accept responsibility for the results of the bid and improper instrument." In such a case, performance of the detrimental act constitutes an offer to a reverse unilateral contract which is accepted by the post-performance promise. Id. § 2-15, at 54-55. Thus, the fact that the detriment was suffered before the promise was given does not preclude a finding that the detriment was induced by the promise.

To appreciate the illogic of the contrary conclusion, one must only consider the outcome if the situation were reversed and Sklar had sent the letter containing the promise before the Bank performed the detrimental acts. Sklar would have been saying, "I will promise to indemnify and defend if you perform the acts of cooperation," and a binding unilateral contract would have arisen when the Bank performed the requested acts. It should make no difference that contractual relations were initiated by the Bank's performance of the detriment with the expectation that the relation would be sealed by a return promise from Sheehan.

This court concludes that the Bank's acts of cooperation constituted legal detriment and were induced by Sklar's promise

16

to indemnify and defend the Bank.  There was sufficient consideration to support Sklar's promise to indemnify and defend the Bank.

### 3.  Lack of Authority

Sheehan seeks to avoid the binding force of Sklar's promise by arguing that Sklar was not authorized to bind Sheehan to a defend and indemnify contract with the Bank.  Vermont Mutual contends that the lack of authority argument must be disregarded because it is an affirmative defense that was not raised in the pleadings.  Sheehan did not raise the lack of authority defense in its answer or its amended answer, but rather waited until filing an objection to the Bank's summary judgment motion to raise the argument.  In the alternative, Vermont Mutual contends that, even if the lack of authority defense is considered, it must be rejected on the merits.

To resolve this dispute, the court must address two related issues--one procedural and the other substantive.  The procedural issue is which party bears the burden of pleading the agency relations between Sklar and Sheehan.  If that burden falls on Sheehan, its failure to plead the affirmative defense in its answer and amended answer may constitute grounds to disregard the defense.  The substantive issue is which party has the burden of proving authority or lack thereof.  Allocating the burden of

17

proof is a necessary predicate to determining which party prevails on the merits.

Which party bears the burden of pleading the agency issue is a federal procedural question, but state law controls the burden of proving agency, or lack thereof. Under the doctrine of Erie Railroad Company v. Tompkins, 304 U.S. 64 (1938), a federal court in a non-federal matter must follow the substantive law of the state in which it is sitting. Thus, state law clearly governs the substantive question of which party has the burden of proof on the issue of agency. Palmer v. Hoffman, 318 U.S. 109 (1943). However, when the Federal Rules of Civil Procedure cover an issue, the Erie rule's mandate to apply state law becomes inapplicable. Hanna v. Plumer, 380 U.S. 460 (1965). The Federal Rules contain provisions allocating the burden of pleading in federal court, and these provisions displace state law counterparts. Rule 8, Fed. R. Civ. P.

Under Rule 8, defendants carry the burden of pleading affirmative defenses. "Want of authority," the defense at issue here, is not in Rule 8's enumerated list of affirmative defenses. However, the list in Rule 8 is clearly illustrative, and not exclusive, providing for "any other matter constituting an avoidance or affirmative defense." Federal courts with apparent unanimity require "want of authority" to be pled affirmatively. See, e.g., Local Joint Exec. Board of Spokane v. Spokane Lodge

18

No. 28, Benevolent & Protective Order of the Elks, 443 F.2d 403, 404 (9th Cir. 1971); Radio Corp. of America v. Radio Station KYFM, Inc., 424 F.2d 14, 18 (10th Cir. 1970) ("The defense of want of authority is an affirmative defense."); Frank Forton & Co. Inc. v. Cook Electric Co., 356 F.2d 485, 493 n. 3 (7th Cir. 1966) (en banc). To treat the "want of authority" defense otherwise than these courts would be to undermine the purpose of the Federal Rules in providing uniform guidelines for federal procedural matters. Thus, under Rule 8, Sheehan carries the burden of pleading "want of authority."

The general rule under Rule 8 is that failure to raise an affirmative defense in the pleadings constitutes a waiver of the right to raise the defense. See American National Bank v. Federal Deposit Insurance Corp., 710 F.2d 1528, 1537 (11th Cir. 1983). However, this general rule has been relaxed when the plaintiff receives notice of the affirmative defense by some means other than the pleadings within a pragmatically sufficient time to respond. The defense will be considered despite the tardiness with which it was pled. Moore, Owen, Thomas & Co. v. Coffey, 992 F.2d 1439, 1445 (6th Cir. 1993).

Despite Sheehan's failure to plead the defense in either its answer or its amended answer, its burden of pleading under Rule 8 will be discharged if Vermont Mutual received notice of the defense in a "pragmatically sufficient time" to respond. There

19

is some dispute as to when Vermont Mutual got wind that Sheehan was asserting a lack of authority defense. Sheehan argues that Vermont Mutual was put on notice by the content of conversations between the parties' attorneys at the pretrial conference held at the courthouse on Nov. 14, 1994. Vermont Mutual denies that such conversations contained any reference to Sheehan's plan to raise the defense. But at the very latest, Vermont Mutual received notice of the lack of authority defense when Sheehan filed its objection to Vermont Mutual's motion for partial summary judgment. The objection memorandum raised the "lack of authority" defense in contesting the propriety of partial summary judgment in favor of Vermont Mutual. Since this objection was filed, Vermont Mutual has had ample time to conduct discovery on the issue of agency between Sklar and Sheehan. Further, Vermont Mutual has pointed to nothing in the discovery process that it would have conducted differently had notice been forthcoming in the pleadings. Thus, Sheehan's objection memorandum put Vermont Mutual on notice of the "want of authority" defense at pragmatically sufficient time, and consideration of the defense despite its absence from the pleadings will not prejudice Vermont Mutual.

Turning to a consideration of the merits of the defense, Sheehan argues that it is entitled to summary judgement on the contract claim because Sklar was not authorized to bind Sheehan to the contract in issue. New Hampshire state courts have yet to

20

allocate the burden of proving authority, or lack thereof in agency disputes. And the fact that the defendant has the burden of pleading "lack of authority" under federal procedural law has no bearing on the substantive question of how the burden of proof should be allocated under New Hampshire law. The federal precedents cited above, holding that lack of authority is an affirmative defense, do not assist the endeavor at hand. Rather, this court must anticipate how the courts of New Hampshire would allocate the burden of proving this issue.

Generally, in allocating burdens of proof, a relevant factor has been which party's contentions deviate more significantly from the most likely state of affairs. EDWARD CLEARLY, MCCORMICK ON EVIDENCE, GEN. ED. § 337, at 787 (2d ed. 1972). The law presumes that events occurring in the past happened as they were most likely to happen, unless the evidence affirmatively indicates otherwise. So, the party advancing the more unusual contentions bears the burden of proving them.

The absence of an agency relationship between two parties is generally the norm, and existence of such relation the exception. Agency is a unique relationship that confers a power on one party to bind another to legal obligations. RESTATEMENT OF AGENCY 2D § 5, at 26 (1958). Such a power is extraordinary, and the existence of an agency relationship between two parties cannot be presumed. So, a plaintiff seeking to hold an alleged principal to legal

21

obligations flowing from the acts of an agent bears the burden of proving the existence of an agency relationship. Once the agency relationship is established, it is more probable than not that the agent is authorized to conduct transactions that similarly situated agents are usually and ordinarily authorized to conduct. Pettit v. Doeskin Prods., 270 F.2d 95, 99 (2d Cir. 1959). The burden then shifts to the principal to show that the agent lacked authority to conduct usual and ordinary transactions. However, the plaintiff retains the burden of proving the agent authorized to enter extraordinary and unusual contracts. Alvey v. Butchka- vitz, 84 S.E.2d 535, 539 (Va. 1954). What is ordinary and usual obviously depends of the facts and circumstances of the particular case. Pettit, supra, 270 F.2d at 99.

Sheehan appointed Sklar, one of its agents, to handle the Bank's foreclosure, and with that appointment flowed authority, the quantity and quality of which is defined by that which "ordinarily and usually" accompanies such appointments, unless Sheehan affirmatively demonstrates otherwise. Appointment of an agent to represent one of the principal's clients ordinarily includes authority to undertake the transactions reasonably necessary to carry out the representation. When the agent creates the risk of adverse legal action for the client during the course of the representation, assumption of that risk through a promise of indemnity may be reasonably necessary to carry out

22

the representation. Otherwise, the client would likely refuse continued cooperation, and the objects of the representation would go unrealized. That the agent would have such authority is especially true in a case such as this where losing the client's continued cooperation could result in the legal liability of the principal. If the Bank refused to cooperate in correcting the original, erroneous documents, the Sheehan law firm would have potentially faced legal liability as a result of the erroneous filing. In securing the Bank's continued cooperation with an indemnity promise, Sklar was doing what he deemed necessary to protect his principal and his client from legal liability arising from a situation that he caused in the course of the representation in the foreclosure proceedings.

Since authority to enter a contract such as the one at issue here would ordinarily be vested in an agent in Sklar's position, Sheehan bears the burden of proving that Sklar was unauthorized to bind Sheehan to the terms of his promise. In order to carry this burden to survive a motion for summary judgment, Sheehan must come forward with sufficient evidence so a reasonable jury could find that Sklar lacked authority. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The question is not "whether there is literally no evidence favoring the non-moving party." Herbert v. Mohawk Rubber Co., 872 F.2d 1104, 1106 (1st Cir. 1989). "If the evidence is merely colorable, or is not

23

significantly probative, summary judgment may be granted." Mack v. Great Atlantic & Pacific Tea Co., 871 F.2d 179, 181 (1989). As evidence, Sheehan offers the affidavit testimony of Sklar and Richards in which they deny having authority. Sklar recounts: "[a]s an associate, I was aware that I did not have authority to bind the firm to defend and indemnify the [Bank] for any and all claims which might ever arise." Sklar Affidavit (attached to Defendant's Objection as Exhibit A). Richards confirms: "[a]s an associate, Attorney Sklar was not authorized to make any agreement with Attorney Falby on behalf of the firm, nor was he instructed by me to do so." Richards Affidavit (attached to Defendant's Objection as Exhibit B(A)).

The affidavits of Sklar and Richards are insufficiently probative of Sklar's lack of authority to carry Sheehan's burden of proof on the agency issue. First, both affidavits expound legal conclusions claiming nothing more than that Sklar did not have authority to bind Sheehan; however, neither affidavit sets forth specific facts upon which those legal conclusions are based. This court is under no obligation to draw speculative inferences of fact from those affidavits, Mesnick v. General Elec. Co., 950 F.2d 816, 827 (1st Cir. 1991), and raw legal conclusions are hardly probative evidence. Second, Sklar's affidavit is inconsistent, claiming that, on the one hand, he was aware that he did not have authority to bind the firm to "defend

24

and indemnify the [Bank] for any and all claims which might ever arise relating to the foreclosure of the Arista property," but going on to claim that his promise to "indemnify and defend" was limited to defending against junior lienholders who challenged the foreclosure. This amounts to a concession that he believed himself to be authorized to bind Sheehan to this more limited, narrow promise. The subtle distinction Sheehan is asking this court to draw between authority to make the narrower promise to defend against only junior lienholders, which was concededly conferred upon Sklar, and the authority to make the broader promise to defend against any and all claims, which was allegedly withheld from Sklar, is unsupported by the evidence.

Furthermore, the evidence offered by Sheehan tends to disprove only one type of authority; namely, express authority, for which the manifestation of intent to confer authority on the agent must flow from the principal to the agent. However, apparent authority may arise from a manifestation from the principal to a third party that the agent is authorized to act on the principal's behalf. In this case, apparent authority could arise from a manifestation from the Sheehan law firm, as principal, to the Bank that Sklar was authorized to bind Sheehan. Both Sklar's and Richards' affidavits relate only to the scope of agency manifestations from Sheehan, the principal, to Sklar, the agent. Neither affidavit makes any mention of the nature of manifesta-

25

tions from Sheehan to the Bank which may form the basis of Sklar's apparent authority.

In the absence of sufficient evidence to negate the existence of Sklar's authority to enter the contract to indemnify and defend, the issue must be resolved in favor of Vermont Mutual. The risk of nonproduction falls on Sheehan, as the party with the burden of proof, and that risk has here materialized.

## 4. Subrogation

Sheehan argues that permitting Vermont Mutual to assume and pursue the Bank's legal claims as assignee/subrogee violates public policy. The attorney-client relationship existed between Sheehan and the Bank, and Vermont Mutual was only tangentially tied to that relationship through its insurance contract with the Bank. According to Sheehan, Vermont Mutual should not be permitted to invade the sanctity of that relationship by suing for breach of the relationship's duties owed to the Bank.[*]

Vermont Mutual seeks to pursue the Bank's legal claims against Sheehan under a theory of legal assignment or, alternatively, equitable subrogation. According to Vermont Mutual, a

---

[*]As Vermont Mutual points out, this argument is most appropriately aimed at Count III of the complaint for implied indemnity. However, since this court ultimately rejects the argument, it will assume that the argument could be viable for all counts in the complaint.

26

contract provision in its insurance policy with the Bank requires the Bank to assign all its legal rights of recovery against any person to Vermont Mutual upon payment under the policy. In the alternative, a transfer of legal rights from the Bank to Vermont Mutual is appropriate, according to Vermont Mutual, under the doctrine of equitable subrogation, which substitutes one person in the place of another with reference to a legal claim when so demanded in the interests of justice and equity. Both doctrines, assignment and subrogation, would fully provide Vermont Mutual with the relief it seeks, as the two are identical in effect, transferring rights from one party to another.

Sheehan urges the court to follow lines of authority from other states holding that claims sounding in legal malpractice are nonassignable.

The harmful consequences of legal malpractice are economic in nature, and claims arising out of pecuniary harm, rather than personal injury, are generally treated as freely assignable choses in action. Dumas v. State Farm Auto Ins. Co., 111 N.H. 43, 46, 274 A.2d 781, 783 (1971); Hedlund Mfg. Co. v. Weiser, Stapler & Spivak, 539 A.2d 357, 359 (Pa. 1988). However, some courts have deviated from this general rule when considering the assignability of legal malpractice claims, relying on policy considerations that are said to justify the exception. Goodley v. Wank & Wank, Inc., 133 Cal. Rptr. 83, 87 (Cal. App. 1976). On

27

the other hand, other courts have refused to create an exception to the general principle favoring free assignability of claims. Oppel v. Empire Mutual Ins. Co., 517 F. Supp. 1305, 1307 (S.D.N.Y. 1991); Hedlund, supra 539 A.2d at 359; Richter v. Analex Corp., 940 F. Supp. 353, 358 (D.C. 1996).

Sheehan urges this court to hold that New Hampshire law prohibits assignment of legal malpractice claims. However, whether legal malpractice claims are assignable is an unsettled issue of state law, as the Supreme Court of New Hampshire has thus far remained silent. While a New Hampshire superior court has decided the issue, Home Builders Assoc. of N.H. v. Coopers & Lybrand, No. 91-E-123, slip op. at 16 (Super. Ct.) (Smukler, J., 1996), this is merely "data from which the law must be derived, Commissioner v. Estate of Bosch, 387 U.S. 456, 477 (1967), rather than a definitive statement of New Hampshire law.

On the other hand, subrogation may be granted without resolving unsettled principles of New Hampshire law. Subrogation flows from equity and, because of its equitable origin and nature, is not governed and controlled in its operation by strict legal rules. 73 AM. JUR. 2D *Subrogation* § 12 (1974). One court has said the following about this equitable tool:

> The principle to be derived from the doctrine of subrogation is that it is born of equity and results from the natural justice of placing the burden where it ought to rest. *It does not flow from any fixed rule of law, but rather from*

28

> *principles of justice, equity and benevolence*. It
> is a purely equitable result, depending like other
> equitable doctrines upon the facts and circum-
> stances of each particular case to call it forth.
> It is a device adopted or invented by equity to
> compel the ultimate discharge of a debt or obliga-
> tion by him, who, in good conscience, ought to pay
> it.

Commercial Union Fire Ins. Co. v. Kelly, 389 P.2d 641, 643 (Okla. 1964) (emphasis added). Given the flexible nature of equity, subrogation would remain a potentially appropriate remedy even if New Hampshire courts held that legal malpractice claims were non-assignable. 73 AM. JUR. 2D *Subrogation*, supra § 21 (discussing fact that subrogation is "quite commonly allowed" for claims otherwise nonassignable). A federal or state court in New Hampshire may grant equitable subrogation regardless of the state of New Hampshire law on the assignment of legal malpractice claims.

Since this court proceeds in the periphery of settled New Hampshire law, federalism concerns counsel hesitancy in making broad statements of law that go beyond the necessities of the case. Vermont Mutual seeks to proceed under either legal assignment or equitable subrogation, but granting relief under the latter absolves this court of any duty to settle the state law question of whether legal malpractice claims are freely assignable. This court relies on the narrower grounds of subrogation and makes no comment, either explicitly or implicitly, on whether

29

the Bank's legal malpractice claim against Sheehan is assignable to Vermont Mutual under New Hampshire law.

Vermont Mutual ought to be permitted to pursue the Bank's claims against Sheehan, and equity considers done that which ought to be done. In determining whether equitable subrogation is appropriate, courts generally examine principles of equity and considerations of public policy. 6A APPLEMAN, INSURANCE LAW AND PRACTICE, § 4054, at 142 (1972). Both public policy and the equities of this case support transferring the Bank's rights to Vermont Mutual so it can proceed against Sheehan.

Subrogation rests on the equitable principle that no one should be enriched by another's loss and that financial burden ought to be shifted from an innocent party who originally pays to the one whose culpable conduct caused the loss. To trigger the hand of equity, the legal wrongdoing said to justify shifting the financial burden must have caused the loss. Paten Scaffolding Co. v. William Simpson Constr. Co., 64 Cal. Rptr. 187, 256 Cal. App. 2d 506 (1967) (as respects subrogation of insurer, liability of wrongdoer may be based not only on tort, but also upon breach of contract, so long as there exists necessary causal relationship between wrong and damage). Thus, "there is no . . . general agreement in decisional law as to the right of the insurer to be subrogated to collateral rights which the [insured] may have against persons who did not cause the loss." In the Matter of

30

Future Mfg. Coop., 165 F. Supp. 111, 113 (N.D. Cal. 1958). For instance, "when an insured vendor has been indemnified by his insurer for loss of property subject to a sales contract, the tendency has been to give the vendee the benefit of the vendor's insurance rather than to subrogate the insurer to the vendor's right to recover the purchase price from the vendee." Id. at 114.

In such a case, the insurer and the vendee are in equipoise on the scales of justice. No considerations of fairness mandate shifting the loss one way or another because both parties are equally obligated by binding promise to pay for the lost property. Equity has no justification to interfere with the legal distribution of rights between the parties and ought to leave the parties as it finds them.

However, in this case, the scales tip in favor of Vermont Mutual. On the one hand, both Sheehan and Vermont Mutual were under contractual obligation to indemnify and defend the Bank. Vermont Mutual's obligation flowed from its insurance contract with the Bank, and Sheehan's from Sklar's promise. Further, the loss from legal challenge to the foreclosure proceedings would have occurred regardless of whether Sheehan breached Sklar's promise to indemnify and defend. Sheehan's legal wrongdoing, the breach of Sklar's promise no more caused the Bank's loss than did Vermont Mutual. It could be argued that Vermont Mutual and

31

Sheehan stand on equal footing as to which party, in terms of fairness, should bear the loss, as both are under equally binding contractual obligations to pay.

But Sheehan was promising to indemnify and defend for loss occasioned by its previous mistakes in conducting the foreclosure sale for the Bank. This is not the case of co-guarantors against loss, neither more culpable than the other. Here, Sheehan's promise to indemnify amounts to an assumption of responsibility for the adverse financial consequences of its previous mistake, and Sheehan's conduct was causally connected to underlying loss. Thus, even though both parties, Sheehan and Vermont Mutual, promised to indemnify the Bank for the loss at issue, equity demands that Sheehan remain primarily liable.

Turning now to whether public policy supports equitable subrogation, this court concludes that it does. As noted earlier, several courts have concluded that public policy dis-favors assignments of legal malpractice claims. Goodley, supra, 133 Cal. Rptr. at 87. However, with respect to subrogation, as distinguished from assignment, the relevant policy considerations weigh differently. Even if the courts prohibiting assignment of legal malpractice claims are deemed to have correctly evaluated the policy considerations relevant to the issue of assignment, subrogation in this case nonetheless comports with sound public policy.

The policy said to disfavor assignment of legal malpractice claims does not, likewise, disfavor equitable subrogation with equal force. See Hospital Services Corp. of R.I. v. Pennsylvania Ins. Co., 227 A.2d 105, 108 (R.I. 1967) (discussing distinction between assignment and subrogation).

The leading statement of those policy considerations is found in Goodley. The court was fearful that free assignability "could relegate the legal malpractice action to the market place and convert it to a commodity to be exploited." Id. Creating a market in claims against allegedly negligent lawyers would, according to the Goodley court, increase the number of legal malpractice claims. The Goodley court could not, however, have been concerned about a general increase in legal malpractice claims, which would of course be desirable if more meritorious claims found their way to court. Justice demands that meritorious claims be redressed so as to maintain checks on substandard legal representation. Increased legal malpractice litigation is only an undesirable state of affairs if a disproportionate number of unmeritorious claims results. Thus the Goodley court must have feared that a market in legal malpractice claims would result in more unmeritorious claims being pursued.

But equitable subrogation does not threaten to convert the legal malpractice claim into an exploitable economic commodity. Subrogation is effectuated by the hand of equity, which operates

outside the marketplace.  Markets are fueled by voluntary transactions, like those possible under a regime of free assignability.  Transfer by subrogation occurs by operation of law, and is distinguishable from voluntary market exchanges like assignments.  The market produces speculators in freely transferable commodities, but equity approves only those transfers dictated by considerations of justice, forestalling the emergence of speculators in legal rights.  Subrogation of an insurance company to the malpractice claim of its insured is not a market transaction, and the insurance company is not a speculator in the law seeking to reap a profit from the misfortunes occasioned by attorney negligence.  Approving such limited transfers falls far short of creating a regime in which legal malpractice claims become an instrument of profit.

The next consideration that caused the Goodley court to create an exception to assignability was the "personal nature of the attorney's duty to the client."  Id.  A market in legal malpractice claims would sanction transfers to "economic bidders who have never had a professional relationship with the attorney and to whom the attorney has never owed a legal duty."  Id.  In 1879, the Supreme Court held that an attorney generally owes no duty to third persons who are not privy to the attorney-client relationship.  Savings Bank v. Ward, 100 U.S. 195, 200 (1879).

As the Goodley court recognized, permitting free assignability would do damage to this privity requirement.

However, the privity requirement has been considerably narrowed with exceptions.  In New Hampshire, the "privity rule is not ironclad . . . and courts have been willing to recognize exceptions particularly where . . . the risk to persons not in privity is apparent."  Simpson v. Calivas, 139 N.H. 4, 5, 650 A.2d 318, 321 (1994); Robinson v. Colebrook Savings Bank, 109 N.H. 382, 385, 254 A.2d 837, 839 (1969).  New Hampshire courts find exceptions to privity more readily when harm to a party outside the attorney-client relationship is foreseeable.  "A common theme to these cases, similar to a theme of cases in which we have recognized exceptions to the privity rule, is an emphasis on the foreseeability of injury to the intended beneficiary."  Simpson, supra, 139 N.H. at 5.

An assignee of legal malpractice claims is generally unconnected by prior ties to the attorney, the client, or the representation.  Such a random assignee has not been harmed at all by the attorney's negligence, much less "foreseeably harmed."  Thus, exceptions to the rule of privity are generally unwarranted for assignments of legal malpractice claims.  However, when, as here, the negligence of the insured's attorney occasions the incidence of an insurance company's liability under an insurance contract, the foreseeability of the harm suffered by the insur-

35

ance company renders an exception to the privity requirement more appropriate. <u>Thurston v. Continental Casualty Co.</u>, 567 A.2d 922, 923 (Me. 1989) (holding that legal malpractice claims may be assigned when the assignee has an intimate connection with the underlying suit). The insurance company is not simply a random, unconnected party that acquired the legal malpractice claim in the market. Rather, the insurance company has a pre-existing contractual relationship with the insured. When an attorney injures the insured through malpractice, it is foreseeable that the injury would be passed on to the insurance company under its contract. The foreseeability of injury to the insurance company of the negligent attorney's client justifies relaxation of privity requirement in this case.

Another policy said to disfavor assignment is protection of attorney-client privilege. In the malpractice action by the assignee, the attorney will be able to divulge privileged communications of the client assignor in defense. Otherwise privileged communications of the client may be disclosed without the client's formal waiver of the attorney-client privilege. However, in this case, Sheehan has not pointed to any privileged communications the Bank seeks to protect which Sheehan plans to disclose in its defense. Allowing subrogation in this case will not do damage to the attorney-client relationship.

Thus the policy disfavoring transfer of legal malpractice claims by assignment does not as strongly disfavor transfer by subrogation. Furthermore, there are policy arguments favoring subrogation that do not factor into the consideration of whether legal malpractice claims should be assignable.

The issue of whether legal malpractice claims are assignable is generally a question of which of two parties, the assignor or assignee, is the more appropriate champion of the claim. Regardless of which party the law favors, the claim will be brought by either the assignor (if the assignment is prohibited) or the assignee (if the assignment is permitted). Either way, the negligent attorney will be made to answer for their negligence. On the other hand, if equity refuses to subjugate the insurer to the rights of the insured, legal malpractice that is compensated by insurance companies will go unvindicated. The victim of malpractice that has been reimbursed by an insurance company has no incentive to proceed against the negligent attorney. The insurance money renders the victim whole and removes the need to expend resources pursuing a legal malpractice claim, even if the law permitted double recovery. Thus, forbidding subrogation of the insurance company effectively extinguishes the legal malpractice claim, and the malpracticing attorney would escape the consequences of his malpractice.

Such a result would undermine the aim of civil remedies for legal malpractice to deter substandard practice of law. The law's deterrence effect is related to the incidence of successful enforcement. Leaving legal malpractice claims fallow by denying subrogation to insurance companies threatens to diminish the prescriptive force of law in this area. Prohibitions against assignments will not produce such consequences because the claim will still be prosecuted by the assignor.

In sum, considerations of equity and public policy support subrogation of Vermont Mutual to the claims of the Bank against the Sheehan law firm. It would be inequitable to allow Sheehan to avoid responsibility for the financial loss that it caused Vermont Mutual as the insurance company of Sheehan's client, the Bank. There is not a single viable policy argument disfavoring subrogation in this case. This court holds that subrogation is appropriate here, but reiterates the narrowness of this holding as implying nothing about the state of New Hampshire law on the assignability of legal malpractice claims.

Sheehan advances one last ground for summary judgment. Sheehan argues that Vermont Mutual cannot be allowed to proceed against Sheehan because the Bank already released Sheehan of any obligations. As part of the settlement negotiations following the Giacalone action, the Bank executed a release of Sheehan. Vermont Mutual only claims rights against Sheehan as the subrogee

of the Bank.  According to Sheehan, since the Bank's rights were extinguished by release, Vermont Mutual can claim no rights through the Bank.

Vermont Mutual argues that the release executed by the Bank contained language preserving Vermont Mutual's rights:

> this Release in no way affects or limits the claims, if any, which the Bank's insurer, Vermont Mutual Insurance Company, may have against the Releasees . . . for recovery of attorney's fees and disbursements relative to Vermont Mutual Insurance Company's defense of the Bank in [the Giacalone actions].

Defendant's Objection, Exhibit B-2.  Sheehan responds that this language meant to preserve only Vermont Mutual's direct rights against Sheehan, but not the indirect rights as the Bank's subrogee.  The parties dispute the intended scope of this preservation clause.

However, the intent of the Bank and Sheehan in executing the release can have no bearing on the rights of Vermont Mutual. Instead, the effect of the release depends on whether Vermont Mutual's rights vested before the Bank's rights were extinguished by the release.  See CALAMARI & PERILLO, supra, § 18-16, at 650 (discussing circumstances under which defenses good against the assignor (such as release) are likewise good against the assignee).  Generally, an assignee or subrogee does not acquire rights that are any broader than those of the primary right holder.  The doctrine of subrogation is not an independent source

of rights, but rather merely transfers rights without altering their scope and contours. Thus, defenses valid against the primary right holder are equally valid against the subrogee, and a party obligated to perform may set forth a release executed by the primary rightholder as a defense to action brought by a subrogee. After execution of a release, there is nothing left to pass by subrogation.

However, once the rights of a subrogee are vested, those rights become immune from any post-vesting agreement between the primary rights holder and the party obligated to perform. Id. Vesting shifts the primary party in interest from the assignor to the assignee and terminates the former's power to alter or defeat the rights of the latter. Thus, post-vesting release agreements between the primary right holder or assignor and the party obligated to perform have no effect on the rights of the subrogee.

The question here is whether Vermont Mutual's rights as the Bank's subrogee vested before the Bank executed the release of Sheehan. There is some authority holding that a subrogee's rights are vested upon full payment of the loss to the primary right holder. General Exchange Ins. Corp. v. Young, 212 S.W.2d 396, 357 Mo. 1009 (1948) (at the moment an insured vehicle is damaged or destroyed by a third person's fault, the collision insurer has a contingent interest in any recovery of damages, which interest becomes a vested right when the insurer discharges

40

its policy obligation to the insured).  However, such a rule works unfairness upon the party who is ostensibly released from legal obligations and discourages settlement negotiations and compromise.  The rule would presumably operate regardless of whether the party who is originally liable has notice of the grounds for subrogation.  Thus the liable party may give up consideration for a release that proves ineffectual against the vested rights of an insurance company who has previously compensated its insured for the loss suffered.

To prevent such double jeopardy, the subrogee's rights should not be deemed vested until the liable party receives notice of the grounds for subrogation.  Upon receiving such notice, any release executed between the liable party and the insured has no effect on the vested rights of the insurance company.

Here, Vermont Mutual's rights against Sheehan were vested before the Bank executed the release of Sheehan.  The clause in the release purporting to preserve Vermont Mutual's rights was clear and unmistakable notice to Sheehan of Vermont Mutual's claim as the Bank's assignee/subrogee, hence the release had no effect on Vermont Mutual's claim against Sheehan.

## Conclusion

For the above reasons, the court conditionally grants plaintiff's motion for partial summary judgment (document 11) on the issue of liability for Count I's contract claim unless the defendant produces sufficient evidence to create a genuine issue of fact concerning Sklar's authority to bind Sheehan to an indemnity contract. Any such production must be filed not later than Monday, February 17, 1997. Defendant's motion for summary judgment (document 20) is denied.

SO ORDERED.


_____
Shane Devine, Senior Judge
United States District Court

January 15, 1997

cc:  Michael Lenehan, Esq.
     Ellen E. Saturley, Esq.